## GROMER, TREASURER OF PORTO RICO, *v.* STANDARD DREDGING COMPANY.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR PORTO RICO.

No. 174.   Submitted February 28, 1911.—Decided April 22, 1912.

*Quære:* whether § 12 of the act of Legislative Assembly of Porto Rico of March 8, 1906, providing that an injunction may issue to prevent collection of illegal tolls, applies to the District Court of the United States for Porto Rico.

Even though the bill might not be sustained because complainant has an adequate remedy or because the court has not power to issue an injunction, the court prefers, in this case, to rest its decision on the fact that the bill should be dismissed upon the merits.

Under § 13 of the Foraker Act of April 12, 1900, 31 Stat. 77, c. 191, and the act of July 1, 1902, 32 Stat. 731, c. 1383, the Territory of Porto Rico has jurisdiction for taxing purposes over the harbors and navigable waters surrounding Porto Rico.

The purpose of the Foraker Act was to give local self-government to Porto Rico, conferring an autonomy similar to that of the States and Territories, reserving to the United States rights to the harbor areas and navigable waters for the purpose of exercising the usual national control and jurisdiction over commerce and navigation.

While the United States can reserve control over such places as it sees fit within a territory to which it gives autonomy, it does not reserve any such places unless it is so expressed in the act.

Property which has acquired a *situs* within the jurisdiction of the Territory of Porto Rico is not exempt from taxation by the Territory simply because it is exclusively used by the owner for carrying out a contract with the Government.

Where jurisdiction to tax property exists, the validity of the tax cannot be determined by an inquiry as to the extent to which the property may be benefited.

In this case there is nothing in the record to show that the property taxed had not acquired a *situs* in Porto Rico or that takes it out of the rule that tangible personal property is subject to taxation by the State or Territory in which it is, no matter where the domicile of the owner may be.[1]

5 Porto Rico Fed. Rep. 142, reversed.

[1] Mr. Justice Day, with whom Mr. Justice Hughes and Mr. Justice

THE facts, which involve the power of Porto Rico to tax machinery and vessels in the harbor of San Juan engaged in work in pursuance of a contract with the United States, are stated in the opinion.

*Mr. Paul Charlton* and *Mr. Foster V. Brown,* for appellant.

*Mr. Charles Hartzell* and *Mr. Manuel Roderiguez-Serra* for appellee.

MR. JUSTICE McKENNA delivered the opinion of the court.

The question in the case is the power of Porto Rico to tax certain machinery and boats which at the time of the levy of the taxes were in the harbor of San Juan engaged in dredging work in pursuance of a contract of the Standard Dredging Company with the United States Government.

The dredging company filed a bill to enjoin the appellant, Treasurer of Porto Rico, from enforcing the tax. Appellant demurred to the bill for insufficiency and want of equity, which was overruled. He declined to answer, and the injunction which had been granted was made perpetual. This appeal was then taken.

The material allegations of the bill are as follows:

The dredging company is a Delaware corporation, with its principal office and place of business at the city of Wilmington, State of Delaware. Gromer is Treasurer of Porto Rico.

That theretofore and prior to April 1, 1908, the dredg-

---

Lamar concurred, dissented solely on this point (see p. 373, *post*) on the ground that the decision of the court below that the property had not acquired a *situs* in Porto Rico was correct and was sufficient to sustain the judgment.

ing company entered into a contract with the United
States Government to dredge certain portions of the
harbor of San Juan and the channel leading from the
ocean to the harbor area. Prior to that date, for use in
connection with its operations under the contract, it
brought to the harbor one dredge, one tugboat, two
scows for dumping material to be removed, one coal scow
and one launch. The boats and machinery are its prop-
erty and have been constantly used by it in the perform-
ance of its contract, and were not used in connection with
any other business or operations, and were at all times
within the harbor where the operations under the con-
tract were carried on. The dredging company has neither
conducted nor carried on any other business in Porto
Rico or the waters adjacent thereto except its operations
under the contract.

Gromer, as Treasurer of Porto Rico, pretending to act
under the revenue laws of Porto Rico, assumed to assess
and levy on the said property as of the value of $75,000
a tax of $1,200, for the fiscal year 1908–9, and he and his
agents "have levied an embargo on part of said prop-
erty . . . and are threatening to foreclose the same
and to sell the property for the purpose of enforcing the
collection of the said alleged tax."

The tax is illegal and its enforcement will be illegal by
virtue of the laws of the United States and of Porto Rico,
and especially by virtue of the acts and proclamations of
Congress and of the President of the United States creat-
ing reservations in and about the island of Porto Rico.
The insular government of Porto Rico is not authorized to
levy or collect any tax in connection with property the
*situs* of which is within the reservation or within any
navigable waters of harbor areas of the island of Porto
Rico. The property of the company has not been brought
within the jurisdiction of the insular government, nor is it
subject to taxation while being employed in the perform-

ance of the contract with the United States and within the harbor area.

It is alleged that the company is without any remedy at law, and an injunction is therefore prayed.

In support of his demurrer appellant contends that the dredging company had an adequate remedy at law and that § 12 of the act of the Legislative Assembly of Porto Rico, approved March 8, 1906 (Acts 1906, p. 86 at 89), which provides that an "injunction may be issued to prevent the illegal levying of any tax, duty or toll, or for the illegal collection thereof, or against any proceeding to enforce such collection . . ." does not apply to the District Court of the United States for Porto Rico. We, however, pass the contention, as we prefer to rest our decision on the merits.

The bill of the dredging company, and its contentions here, are based on two propositions: (1) the property was not within the jurisdiction of Porto Rico but was within the harbor area reserved by the United States; (2) the property was being used "within the harbor area" in the performance of a contract with the United States and therefore not subject to taxation for insular purposes.

To sustain the first proposition § 13 of the Foraker Act (April 12, 1900, 31 Stat. 77, c. 191) is relied on and the act of Congress of July 1, 1902 (32 Stat. 731, c. 1383).

Section 13 (31 Stat. 80) reads as follows:

"That all property which may have been acquired in Porto Rico by the United States under the cession of Spain in said treaty of peace in any public bridges, road houses, water powers, highways, unnavigable streams, and the beds thereof, subterranean waters, mines, or minerals under the surface of private lands, and all property which, at the time of the cession belonged, under the laws of Spain then in force, to the various harbor works boards of Porto Rico, and of the harbor shores, docks, slips, and reclaimed lands, *but not including harbor areas or*

*navigable waters*, is hereby placed under the *control* of the government established by this Act to be administered for the benefit of the people of Porto Rico; and the legislative assembly hereby created shall have authority, subject to the limitations imposed upon all its acts, to legislate with respect to all such matters as it may deem advisable." [Italics ours.]

Under the act of Congress of July 1, 1902, a division of the public properties of Porto Rico was made under which the President of the United States was authorized to reserve certain public properties for the use of the Federal Government. The properties not reserved were granted to the Government of Porto Rico to be held or disposed of for the use and benefit of the people of the island. The reservations included lands and buildings for army and navy and other Federal governmental purposes. The exception of harbors and navigable streams was as follows:

"And all the public lands and buildings, not including harbor areas and navigable streams and bodies of water and the submerged lands underlying the same, owned by the United States in said island and not so reserved," etc.

Considering these provisions alone it is, we think, manifest that they only provide for proprietary reservations and dispositions and not for limitations upon the exercise of government. This conclusion is confirmed by § 1 of the Foraker Act, which provides that the provisions of the act "shall apply to the Island of Porto Rico and to the adjacent islands and waters of the islands lying east of the seventy-fourth meridian of longitude west of Greenwich, which were ceded to the United States by the Government of Spain by treaty entered into on the tenth day of December, eighteen hundred and ninety-eight; and the name Porto Rico, as used in this Act, shall be held to include not only the island of that name, but all of the adjacent islands, as aforesaid."

As early as 1901 the control by the Government of the

United States over Porto Rican waters came up for consideration and was referred by the Secretary of War to the Attorney General for determination.  The elements in question were the River and Harbor Act of 1899 (March 3, 1899, 30 Stat. 1151, c. 425) and the act of April 12, 1900, "temporarily to provide revenues and a civil government for Porto Rico, and for other purposes." 31 Stat. 77, 80. Section 14 of the latter act provided, with certain exceptions, that the statutory laws of the United States not locally inapplicable should have the same force and effect in Porto Rico as in the United States.  Section 13 provided that certain harbor property which at the time of the cession belonged, under the laws of Spain, to the various Harbor Works Boards of Porto Rico, "but not including harbor areas or navigable waters," should be "placed under the control of the government established by this act and to be administered for the benefit of the people of Porto Rico."  The Legislative Assembly created by the act was given authority "to legislate with respect to all such matters" as it might deem advisable, and this authority was extended to all matters of a legislative character not locally inapplicable.  It was further provided that all laws should be referred to Congress, which reserved the power to annul the same.

The River and Harbor Act of March 3, 1899 (30 Stat. 1121, 1151, c. 425) prohibited unauthorized obstructions to navigation in any of the waters of the United States, and provided for control by the Secretary of War of wharves and similar structures in ports and other waters of the United States.

The Attorney General expressed the opinion that under these statutes the coastal waters, harbors and other navigable waters of the island were waters of the United States and that a license granted by the Secretary of War to build a wharf in the harbor, given before the ratification of the treaty with Spain, was valid, and that the

power under the license to rebuild the wharf, which had been destroyed by fire, continued as against the control of the Executive Council of Porto Rico. Commenting on the provisions of the River and Harbor Act and the acts in regard to Porto Rico, it was said that Congress, since the ratification of the treaty with Spain, has nowhere indicated that Porto Rican waters are not to be regarded as waters of the United States, nor directed that the authority of the Secretary of War, under the River and Harbor Act of 1899, shall not extend to the Porto Rican waters. "On the contrary, Congress has used language in the Porto Rican Act, as, for instance, in section 13, which clearly contemplates national jurisdiction over those waters as waters of the United States." 23 Op. Atty. Genl. 551. In other words, the jurisdiction of the United States over those waters was the jurisdiction that the United States had over all other navigable waters, an exercise of which the River and Harbor Act was an example.

This is made clear by a subsequent opinion, in which it was declared "that Congress had committed to local control, subject to the express limitation upon the local legislative power, the administration of certain public property and utilities, including 'harbor shores, docks, slips, and reclaimed lands,' but excluding 'harbor areas or navigable waters.'" And, speaking of §§ 12 and 13 of the Porto Rican Act of April 12, 1900, it was said that the "obvious implication" from them is "that the General Government retains title to, possession of, and control over certain other public property, of which fortifications and their appurtenances are specified, and also reserves for its own administration the usual national powers over lights, buoys, and other matters affecting navigation or 'works undertaken by the United States.'" And it was said, further: "From all this it is certain that the ordinary national control of the marine belt affects the coastal

waters of Porto Rico as well as those of any State or any other Territory of the United States." But as to the "harbor margins" it was said that "the Government of the United States, by reason of these grants . . . to Porto Rico, is in the same position with reference to the island government, as well as to private owners, as it would be in a similar case affecting a State of the United States." 23 Op. Atty. Genl. 564, 566.

From this principle it was concluded that the United States could not appropriate the islands of Culebra for a naval base, they being within the limits described in § 1 of the act of April 12, 1900. And § 1 of that act is identical with § 1 of the Foraker Act and its provisions for "harbor areas and navigable waters" are the same as in the Foraker Act. The views of the Attorney General, therefore, are expressly applicable, for the language of the act of April 12, 1900, which determined them, was repeated in the Foraker Act, which we are now called upon to consider.

The distinction made between local control of property and the exercise of government is a substantial one and is illustrated in cases. *Shively* v. *Bowlby,* 152 U. S. 1, 30; *Thomas* v. *Gay,* 169 U. S. 264; *Fort Leavenworth R. R. Co.* v. *Lowe,* 114 U. S. 525; *Id.* 542; *Western Union Telegraph Co.* v. *Chiles,* 214 U. S. 274, 278; *Reynolds* v. *People,* 1 Colorado, 179, 181; *Scott* v. *United States,* 1 Wyoming, 40; *Territory* v. *Burgess,* 8 Montana, 57.

We have seen that by § 1 of the Foraker Act all of its provisions are made applicable to a certain defined area, and that the name Porto Rico "shall be held to include not only the island of that name, but all adjacent islands and waters of the islands." The governmental powers conferred upon Porto Rico must be coextensive with that area, subject to the reservation that all laws passed shall not be in conflict with the laws of the United States, and the power of enacting such laws is conferred upon the Legislative Assembly. There is precaution against abuse.

They must be reported to Congress, which has the power to annul them.

The purpose of the act is to give local self-government, conferring an autonomy similar to that of the States and Territories, reserving to the United States rights to the harbor areas and navigable waters for the purpose of exercising the usual national control and jurisdiction over commerce and navigation.

The United States could have reserved government control and exercised it as it does in instances, by the consent of the States, over certain places in the States devoted to the governmental service of the United States. We do not think, as we have said, that the United States has done so, and that it has not is the view of the executive department of the Government as expressed through the Attorney General. The War Department entertained the same view as to military reservations in Porto Rico and also as to such reservations in the Philippine Islands.

Section 12 of the Philippine Act placed all property rights acquired from Spain under the control of the island government for the benefit of its inhabitants, except "such land or other property as shall be designated by the President of the United States for military and other reservations for the Government of the United States." The extent of the power thus reserved was referred for consideration by the Secretary of War to the Attorney General, and in an opinion written by Solicitor General Hoyt and approved by Attorney General Moody it was held that the provisions granted and reserved property, but did not confer governmental jurisdiction. It was said in the course of the opinion, after referring to the provisions of the Philippine Act which directed that all laws passed by the Philippine Government should be reported to Congress and the reservation by Congress of the power to annul the same (a similar provision is in the Porto Rico

Act), that "the relation of Congress to all territorial legislation is similar [certain organic acts of the States being cited], and thus it may be said that the exercise of local jurisdiction for ordinary municipal purposes over a reservation in a territory is valid until and unless disapproved by Congress." 26 Op. Atty. Genl. 91, 97.

There is an allegation in the bill that the property was not "subject to any lien or burden of taxation while being employed in the performance of its said contract with the United States of America and within the said harbor area." It is not clear what is meant by the allegation. So far as it means that the property is an instrument of the National Government and not subject, therefore, to local taxation, the contention cannot prevail. *Baltimore Ship Building & Dry Dock Co.* v. *Baltimore*, 195 U. S. 375, 382. Indeed, the contention is a very broad one and would seem to be independent of the situation of the property, and, if true at all, would apply to property employed in the service of the United States, wherever situated and no matter to what extent employed. Appellant discusses it somewhat. We shall consider it in the aspect presented by appellee. Counsel say that "the basic and underlying principle which must control in the determination of the case is as to the extent of the control or jurisdiction of the insular government over the harbor of San Juan, and in this connection as to whether or not property situated entirely within the harbor area, engaged in operations connected with the lands underlying such harbor area, could receive any benefit from the expenditure from moneys raised by the insular government from taxation."

There is a confusing mixture of elements. If Porto Rico had jurisdiction over the harbor area it had jurisdiction to tax property which was situated in the harbor, no matter how engaged; and, being so situated, the validity of the tax upon it cannot be determined by an inquiry of

the extent it may be benefited. *Thomas* v. *Gay, supra; Wagoner* v. *Evans,* 170 U. S. 588.

It, however, may be said that the property was only temporarily in the waters of Porto Rico and that its *situs* was at the domicile of the dredging company.

The fact is not alleged, and no other fact which removed the property from the application of the rule that tangible personal property is subject to taxation by the State in which it is, no matter where the domicile of the owner may be. *Old Dominion Steamship Co.* v. *Virginia,* 198 U. S. 299, 305.

The allegation is that prior to the first of April, 1908, the property was brought to and within the harbor of San Juan. The date is that of the assessment and levy of the tax, but whence the property had been brought, or how long it had been in the harbor before the levy of the tax, is not averred, nor was it necessary from the purpose of the cause of action alleged. There is not an intimation that the property had its *situs* for taxation elsewhere. The claims of exemption from the tax, and the only claims of exemption, were: (1) That Porto Rico, by virtue of the laws of the United States and of Porto Rico, and especially by virtue of those acts and proclamations of Congress and of the President of the United States creating reservations in and about the Island of Porto Rico, was "not authorized to levy or collect any tax in connection with property the *status* [*situs?*] of which" was "within such reservation, or within any navigable waters or harbor areas of the said island of Porto Rico." (2) That the property was not subject to taxation "while being employed in the performance of" the dredging company's "contract with the United States of America and within the said harbor area."

These allegations are, as we have already seen, the basis of the contentions made and argued by the company. It is true that after discussing them counsel "in-

vite the attention of the court" to "certain other considerations" expressed in the opinion of the court below. To analyze or summarize the opinion would extend our discussion unduly. Elements that are really independent are mingled somewhat, making it difficult to assign the exact strength given to them respectively, but we think the basis of the decision was, as it is of the contentions discussed by counsel for the company, that the property was not subject to the taxing power of Porto Rico because of its situation within the harbor area and because the title to such area had been reserved to the National Government, an untenable position, as we have seen.

*Decree reversed, with directions to sustain the demurrer and dismiss the bill.*

MR. JUSTICE DAY, with whom concurred MR. JUSTICE HUGHES and MR. JUSTICE LAMAR, dissenting.

We are unable to concur in the judgment just pronounced. The reversal of the judgment below is, in our view, inconsistent with decisions heretofore made in this court concerning the power of taxation.

We agree with the decision of the court that the Territory of Porto Rico has jurisdiction for taxing purposes over the harbor and waters in question and that the use of the property for Government purposes does not exempt it from taxation, and therefore do not dissent from anything that is said in the opinion of the court upon those subjects. Our objection to the judgment of reversal is that, as we see it, there is a ground of decision in the court below, ample to sustain its decree, which does not turn upon the determination of the controversy as to the political jurisdiction over these waters. In our opinion, the property of the Dredging Company had not acquired a taxable *situs* within the jurisdiction of the Territory of Porto Rico.

The case was heard upon demurrer, and we must therefore take the allegations of the bill well pleaded to be true. From them it appears that prior to the first day of April, 1908, complainant company, a corporation of the State of Delaware, having its principal office and place of business at Wilmington, in that State, entered into a contract with the United States to perform certain services in connection with the dredging of portions of the harbor of San Juan, Porto Rico, and the channel leading from the ocean to the harbor. The bill alleges:

"That by virtue of the requirements of the said contract your orator did, prior to the said first day of April, 1908, bring to and within the said harbor area of the said harbor of San Juan certain boats and machinery, to be used by it in connection with its operations under the said contract, to wit, one dredge, one tugboat, two scows for dumping material to be removed, one coal scow and one launch. That the said machinery and boats so brought by the said complainant and used in connection with its operations under said contract in the said harbor area of the harbor of San Juan were and are the property of the said complainant Company, and since the same were so brought to the said harbor area the same have been constantly used by the said complainant and engaged in its operations in carrying out its said contract with the said the United States; and the same have not been used in connection with any other business or operations whatsoever, and the same have at all times been entirely within the said harbor areas where the said operations under said contract were so being carried on. And your orator further states that it has not conducted or carried on any business in Porto Rico or in the waters adjacent thereto, except the said operations under the said contract with the United States aforesaid."

It is further alleged that on the first day of April, 1908, the taxing officer of Porto Rico undertook to levy a tax

of $1,200 upon a valuation of the property at $75,000, under the laws of the Territory, as of that date.

The case was submitted upon briefs without argument. In the brief of the Attorney General, as well as that of the appellee, the question principally argued concerns the jurisdiction of the Territory of Porto Rico over the harbor and waters of the bay. In the brief of the Attorney General argument is made and cases are cited to sustain the claim that the *situs* of the property for the purposes of taxation was within the jurisdiction of the Territory. In the brief submitted by the appellee reference is made to the opinion of the court for additional reasons for supporting the decree, which reasons are not adverted to at length in the brief. In the opinion of the court the allegations of the bill are treated, as might rightly be done, as raising the question of taxable *situs* of this property, and, among other things, the judge says (p. 146):

"It has, we think, been settled by numerous recent decisions of the Supreme Court of the United States, that the old rule of personal property following the domicil of the owner has been so varied and departed from as that it does not mean very much at the present time; the real question to be decided in every such case being whether the personal property—be the same rolling stock, machinery, merchandise, or even floating property, such as steamships, boats, or dredges—has been brought within the taxing jurisdiction of the government attempting to levy the tax. In other words, it must always be determined that the *situs* of the property is within the taxing jurisdiction. See *Old Dominion Steamship Co.* v. *State of Virginia*, 198 U. S. 299, and the many cases cited. Also *Ayer & Lord Tie Co.* v. *State of Kentucky*, 202 U. S. 409, and cases cited, and *Metropolitan Life Insurance Company* v. *New Orleans*, 205 U. S. 395, and citations."

After consideration of the subject the court reached the conclusion, not only that the local government of Porto

Rico had no jurisdiction over the harbor and waters where this work was done, but that the property had no taxable *situs* in Porto Rico. See pp. 154 and 155, Vol. V, Porto Rico Federal Reporter.

It is well settled that property outside of the jurisdiction of a State cannot be taxed within the due process clause of the Fourteenth Amendment. *Louisville &c. Ferry Co.* v. *Kentucky*, 188 U. S. 385; *Delaware, L. &c. R. R. Co.* v. *Pennsylvania*, 198 U. S. 341; *Union Refrigerator Transit Co.* v. *Kentucky*, 199 U. S. 194.

As a general rule, in the absence of a *situs* elsewhere, the domicile of the owner is the place where personalty is taxable. As was said in *Tappan* v. *Merchants' National Bank*, 19 Wall. 490, by Mr. Chief Justice Waite, speaking for the court (p. 499):

"Personal property, in the absence of any law to the contrary, follows the person of the owner, and has its *situs* at his domicile. But, for the purposes of taxation, it may be separated from him, and he may be taxed on its account at the place where it is actually located. These are familiar principles, and have been often acted upon in this court."

To the same effect, see *St. Louis* v. *Wiggins Ferry Co.*, 11 Wall. 423; *Bristol* v. *Washington County*, 177 U. S. 133; *Ayer & Lord Tie Co.* v. *Kentucky*, 202 U. S. 409.

In *Buck* v. *Beach*, 206 U. S. 392, this court, while recognizing the rule of taxable *situs* of personal property as distinguished from the domicile of the owner, held that notes temporarily within a State, although in the possession of an agent of the owner and there held for collection, were not within the taxing power, where the owner lived elsewhere.

It requires a showing that the property sought to be taxed is incorporated in or commingled with the property of the taxing authority, before it can become liable to taxation in any other jurisdiction than that of the domicile

of the owner. *Commonwealth* v. *American Dredging Co.*, 122 Pa. St. 386 (see *infra*).

The decisions in this court indicate that personal property of a tangible character, to become taxable, must have acquired a *situs* of a permanent nature within the jurisdiction of the authority seeking to levy the tax. The use of the term "permanent" in this connection may not mean the continued and unchangeable location of the property at a given place, but certainly does intend to include the idea of location which is not of a temporary or fleeting character.

As was said by this court in *Morgan* v. *Parham*, 16 Wall. 471, 476, in declaring that a vessel engaged in interstate commerce was not subject to taxation in the city of Mobile, Alabama, although it was physically within the limits of the city in the course of navigation:

"It is the opinion of the court that the State of Alabama had no jurisdiction over this vessel for the purpose of taxation, for the reason that it had not become incorporated into the personal property of that State, but was there temporarily only."

In *Old Dominion Steamship Co.* v. *Virginia*, 198 U. S. 299, it was held that certain vessels engaged in interstate commerce and registered outside of the State of Virginia were taxable in that State, it appearing that they were continuously used in navigating the waters of that State. Of that case this court said in *Southern Pacific Co.* v. *Kentucky*, 222 U. S. 63, 72:

"The case of *The Old Dominion Steamship Company* v. *Virginia*, affords an instance of where the domicile of the owner as a taxing situs was held to have been lost and a new taxing *situs* acquired by reason of a permanent location within another jurisdiction. But in that case the judgment was rested upon the fact that the vessels had for years been continuously and exclusively engaged in the navigation of the Virginia waters, which State had

thereby acquired jurisdiction for imposing a tax as upon property which had become incorporated into the tangible property within her territory."

In *Ayer & Lord Tie Co.* v. *Kentucky, supra,* this court had occasion to consider the taxation of vessels plying between the ports of different States, and it was held that where a vessel has acquired an actual *situs* in a State other than that which is the domicile of the owner, it may be taxed, because it is within the jurisdiction of the taxing authority, and, after reviewing the previous cases in this court, Mr. Justice White, speaking for the court, said (p. 423):

"But, if enrollment at that place was within the statutes, it is wholly immaterial, since the previous decisions to which we have referred decisively establish that enrollment is irrelevant to the question of taxation, because the power of taxation of vessels depends either upon the actual domicil of the owner or the permanent *situs* of the property within the taxing jurisdiction."

As was said in one of the latest of this court's deliverances upon the subject, *Metropolitan Life Ins. Co.* v. *New Orleans,* 205 U. S. 395, "but personal property may be taxed in its permanent abiding place, although the domicile of the owner is elsewhere."

And in the latest deliverance of this court upon the subject, *Southern Pacific Co.* v. *Kentucky, supra,* decided at this term, the principle is again stated and applied, that tangible personal property, unless it has acquired an actual *situs* elsewhere, is taxable at the domicile of the owner.

In all the cases to which our attention has been called, decided in this court, the idea of permanency in the abiding place is emphasized as essential to taxable *situs*—that is, the property sought to be taxed must become "commingled" with the property of the State (*Old Dominion Steamship Co.* v. *Virginia, supra*), or "intermingled" with

the general property of the`State (*Delaware, L. &c. R. R. Co.* v. *Pennsylvania, supra*), or "permanently located" there (*Union Refrigerator Transit Co.* v. *Kentucky*, 199 U. S. 194), or "incorporated in" the local property (*Southern Pacific Co.* v. *Kentucky, supra*). All these expressions indicate the idea of a permanent *situs* of the property.

The question then comes to this: When the Porto Rico authorities, on the first of April, 1908, undertook to levy this tax upon the dredging outfit, had it acquired a *situs* in that jurisdiction for the purpose of taxation? Answering this question, we must bear in mind that there is no showing that the property was permanently located in San Juan harbor, in the sense we have indicated, but that, on the contrary, it appears it was brought into Porto Rico for the purpose of carrying out a Government contract upon which the owner of the property had entered at the time of the attempted taxation; that it was not used in connection with any other business or operation whatsoever, but had been continuously and entirely engaged in carrying out the contract for which it was taken to Porto Rico, and that the owner of the property had not engaged in any operations in Porto Rico or the waters thereof, except only those under the contract with the United States.

Tangible personal property is taxable at the owner's domicile, except where it is shown to have an actual *situs* elsewhere, and, as we have seen, actual *situs* is not gained when the property comes only temporarily within the taxing jurisdiction. Applying this test, we are of the opinion that this dredging outfit had not become incorporated into the personal property of the Territory of Porto Rico, as manifestly it was there temporarily only. In our judgment this situation falls far short of a location in Porto Rico sufficient to subject it to the taxing power of that Territory.

The cases relied upon and cited in the brief of the At-

torney General of Porto Rico, *National Dredging Co.* v. *The State*, 99 Alabama, 462, and *North Western Lumber Co.* v. *Chehalis County*, 25 Washington, 95, are entirely different in their facts.

In the Alabama case the dredging outfit was held presumably to be in Mobile Bay for the purpose of carrying out a series of contracts in the line of the dredging company's business. The court says (p. 465):

"Indeed, as appears from this record, other property of the same kind, which had previously been used by residents of Alabama in the prosecution of this work, was purchased by the appellant company, and, being incorporated with that involved here, has all along been used like it in dredging the channel of Mobile Bay, and one scow so used was built in the city of Mobile, and has never been, we assume, outside of the State."

And the court further says (p. 466):

"In other words, taking into consideration the business of the corporation, the amount and continuing character of the work to be done in Mobile Bay, the preparations made by the company for doing so much thereof as is authorized under one annual appropriation, it may be that this property will be for years engaged upon this work, as a part of that now being used by the company of like kind with this had been used thereon for a year or years prior to 1891. On this state of the case—or even leaving out of view the considerations last adverted to—it is clear, we think, that this property is not merely temporarily within Alabama, but that, to the contrary, its presence here is for such an indefinite period as involves the idea of permanency, in the sense in which that term is used with respect to the *situs* of property for the purposes of taxation."

In the Washington case, the property sought to be taxed was certain tugboats, which were claimed to be exempt from taxation because they were registered at a

port in another State. The evidence disclosed that these tugs had been in use in the State of Washington from four to seven years and not elsewhere, and that the only absence of the tugs from the harbors of that State was for the temporary purpose of repairs, and further, that they were used for all those years appurtenant to and as a part of the lumber plant and business of the lumber company in the county and State where taxed. Under such circumstances the Supreme Court of Washington held that the tugs were permanently in Washington, transacting a local business, and had acquired a taxable *situs* within that State.

A statement of these cases readily distinguishes them from the one at bar. In the case now before us it was sought to tax the dredging property upon its removal from the domicile of its owner for the performance of a single contract and for the transaction of no other business whatsoever, and presumably, as the court below said, not to remain in the jurisdiction beyond the term of the contract for which it was used. To tax property in this situation, it seems to us, would be extending the doctrine of taxable *situs* elsewhere than at the owner's domicile beyond any authority shown, and certainly beyond the reason of the rule. If property thus located could be taxed, the same principle would permit the taxing of a dredging outfit upon the Great Lakes of the country, frequently moving from port to port, in the performance of dredging contracts, in every jurisdiction where it might temporarily be, as well as at the domicile of the owner, where such property could unquestionably be reached.

In *Commonwealth* v. *American Dredging Co., supra,* where a dredging outfit was specifically involved, the Supreme Court of Pennsylvania held that so much of the capital stock of the corporation as was invested in the State of New Jersey in a dredging outfit, namely, $92,000 in four dredges which were built outside of the State of

Pennsylvania, three of which had never been within the limits of that State and the fourth of which had never been within its limits until after the end of the year; $6,000 in a tug which was built outside of the State of Pennsylvania and was not within its limits during the year, and $38,500 in eleven scows, built outside of the State of Pennsylvania and never within its limits, the property all being employed for corporate purposes in the States of New Jersey, Maryland and Virginia, was nevertheless subject to taxation in the State of Pennsylvania, which was the domicile of the American Dredging Company, the owner of the property. In reaching that conclusion Mr. Justice Paxson, who spoke for the court, said (p. 391):

"It must be conceded that the property in question must be liable to taxation in some jurisdiction. If it were permanently located in another state, it would be liable to taxation there. But the facts show that it is not permanently located out of the state. From the nature of the business, it is in one place to-day and another to-morrow, and, hence, not taxable in the jurisdiction where temporarily employed. It follows that if not taxable here, it escapes altogether. The rule as to vessels engaged in foreign or interstate commerce is that their situs, for the purpose of taxation is their home port of registry, or the residence of their owner, if unregistered. *Pullman Palace Car Co.* v. *Twombly,* 29 Fed. Rep. 66; *Hays* v. *Pacific Mail Steamship Co.,* 17 How. 596.

"These vessels, if they may be so called, were not registered. Hence their *situs* for taxation is the domicil of the owners. This rule must prevail in the absence of anything to show that they are so permanently located in another state as to be liable to taxation under the laws of that state."

That case was commented on in the opinion of this court in *Delaware, L. &c. R. R. Co.* v. *Pennsylvania, supra,* in which it was held that the capital stock of a corporation

represented by property in stocks of coal which had been sent out of the State and were deposited in other States for sale could not be taxed.

Of the *Dredging Company Case,* Mr. Justice Peckham, speaking for this court, said (p. 356):

"Such property is entirely unlike the property involved in *Commonwealth* v. *American Dredging Co.,* 122 Pa. St. 386. That property consisted of vessels, or scows, or tugs, only temporarily out of the State of Pennsylvania, for the purpose of engaging in business, and liable to return to the State at any time, and was without any actual *situs* beyond the jurisdiction of the State itself."

We think, therefore, that the property in question was taxable in Delaware at the domicile of the owner, and we agree with the District Court in its conclusion that it had not acquired a taxable *situs* in Porto Rico.

For this reason we dissent from the judgment of the court.