(85 South. 729)

## WEBB v. J. G. WHITE ENGINEERING CORPORATION et al. (8 Div. 226.)

(Supreme Court of Alabama. May 14, 1920. Rehearing Denied June 30, 1920.)

**1. States ⊙=4—Legislation of Congress supreme law of land.**

Where Congress may legislate on a given subject and has done so, criminally or civilly, such legislation is the supreme law of the land.

**2. Evidence ⊙=48—That Congress assumed jurisdiction over Muscle Shoals judicially known.**

It is a matter of common knowledge that Congress assumed jurisdiction over the reservation at Muscle Shoals at Sheffield during the war.

**3. United States ⊙=3—State courts had no jurisdiction of action for injuries to employé on nitrate plant at Muscle Shoals.**

In view of Const. U. S. art. 1, § 8, par. 17, Code Ala. 1907, §§ 898, 899, Act Cong. June 3, 1916 (U. S. Comp. St. § 3110b), and the federal Employés' Compensation Act (U. S. Comp. St. §§ 8932a–8932uu), the state courts had no jurisdiction of an action by an employé against an engineering corporation doing work on nitrate plant No. 2 at Muscle Shoals at Sheffield, where plaintiff's injuries occurred in a bunkhouse under the control of the Air Nitrates Corporation; Congress having assumed jurisdiction of the reservation.

**4. Evidence ⊙=46 — Judicial notice that United States Employés' Compensation Commission declared employés working on reservation to be federal employés.**

The court takes judicial knowledge of the fact that Employés' Compensation Commission under the federal Employés' Compensation Act (U. S. Comp. St. §§ 8932a–8932uu), declared the employés of the United States Nitrate plant No. 2 at Muscle Shoals to be federal employés within the contemplation of the act.

Appeal from Circuit Court, Colbert County; C. P. Almon, Judge.

Action by Verdo Toy Webb against the J. G. White Engineering Corporation and another for damages for personal injuries. Judgment for the defendants, and plaintiff appeals. Affirmed.

E. W. Godbey, of Decatur, for appellant.

The defendant was not a servant of the government. 96 U. S. 421, 24 L. Ed. 847; 39 Stat. at Large, 747; (D. C.) 256 Fed. 552; 141 U. S. 543, 12 Sup. Ct. 81, 35 L. Ed. 851; 162 N. Y. 638, 57 N. E. 1116; 91 Kan. 450, 138 Pac. 632, 50 L. R. A. (N. S.) 574; 220 N. Y. 184, 115 N. E. 470; 125 Tenn. 98, 140 S. W. 747, 39 L. R. A. (N. S.) 586; 246 U. S. 28, 38 Sup. Ct. 271, 62 L. Ed. 560; 250 U. S. 46, 39 Sup. Ct. 393, 63 L. Ed. 835.

Andrews & Peach, of Sheffield, for appellees.

The pleas were good and the cause should be affirmed. Section 8, art. 1, par. 17, Const. U. S.; section 898, Code 1907, and section 899, Code 1907; U. S. Compiled Statutes 1916, pp. 4358, 4359; U. S. Compiled Statutes 1916, p. 9780; 114 U. S. 525, 5 Sup. Ct. 995, 29 L. Ed. 264; 224 U. S. 369, 32 Sup. Ct. 499, 56 L. Ed. 801; 214 U. S. 278, 29 Sup. Ct. 613, 53 L. Ed. 994; 209 U. S. 37, 28 Sup. Ct. 422, 52 L. Ed. 670; 146 U. S. 330, 13 Sup. Ct. 60, 36 L. Ed. 991; 110 Va. 712, 67 S. E. 349, 27 L. R. A. (N. S.) 436, 135 Am. St. Rep. 953; 208 N. Y. 271, 101 N. E. 891, 47 L. R. A. (N. S.) 1031.

THOMAS, J. The suit was for personal injury sustained on a government reservation. Defendants filed pleas 1 to 5, inclusive; demurrers as to pleas 1 and 5 were overruled, and plaintiff took a nonsuit by reason of this adverse ruling of the court. Paterson & Edey Lumber Co. v. Bank of Mobile, 84 South. 721.[1] The sufficiency of said pleas, against the grounds of demurrer assigned, is challenged by the appeal.

Plaintiff averred that he was employed to work by the J. G. White Engineering Corporation (defendant); that by virtue of his contract and as a part of his compensation said employer engaged to furnish his lodging, and assigned him to a certain place, known as a "bunkhouse," at Sheffield, Ala., con-

---

⊙=For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
[1] 203 Ala. 536.

trolled by the defendant Air Nitrates Corporation. It is averred that "it became the duty of the defendant to use reasonable effort and diligence to keep said premises in a reasonably safe condition with respect to fire," and that as to this "defendants conducted themselves carelessly and negligently and indifferently, and were so guilty of a lack of ordinary care and precautions with respect to said premises that by reason of such remissness" said house was a "fire trap" and dangerous, and on or about the night of June 18, 1918, by reason of the inflammable condition of the premises, and while plaintiff was so lodging, under the aforesaid arrangement and condition, the premises caught fire, owing to such negligence of defendant, which fire was unextinguished, and, by reason of such negligence, enveloped plaintiff, and severely burned and stifled him before, by reasonable effort, he could escape or be rescued therefrom. The plaintiff catalogues his injuries, some of which are averred to be of a permanent nature; and his damages averred are for loss of time, wages, and salary, expenses incurred for medical and surgical attention and professional nursing.

Pleas 1 to 5, inclusive, in bar of the prosecution of this suit, challenge the jurisdiction of the court for that the cause of action declared on occurred on the plant site of United States Nitrate Plant No. 2; that said land was purchased by the United States by the consent of the Legislature of the state of Alabama, for the erection thereon of forts, magazines, arsenals, dockyards, or other needful buildings within the contemplation of article 1, section 8, paragraph 17, of the Constitution of the United States. Of the pleas in question, plea 5 best states the defense, which is as follows:

"Come the defendants and plead to the jurisdiction of the court and allege and show unto the court that the cause of action counted on in the complaint arose, and that the accident or injury referred to in said complaint occurred on the plant site of United States Nitrate Plant No. 2; that United States Nitrate Plant No. 2 was constructed by the federal government under an act of Congress approved June 3, 1916, and shown as paragraph 2589 of Barnes' Federal Code, under which act of Congress the President is authorized and empowered to lease, purchase, or acquire such lands and rights of way as may be necessary for the construction and operation of a nitrate plant or nitrate plants, and in which said act of Congress the President is authorized and empowered to employ such officers, agents, or agencies as may in his discretion be necessary to enable him to carry out the said purpose of the act of Congress, and in said act of Congress is provided that the plant provided for under said act shall be constructed and operated solely by the government for the purpose of the production of nitrates and other products and munitions of war, and useful in the production of fertilizer and other useful products. And defendants allege that said plant was constructed by the United States on land purchased by the United States by the consent of the Legislature of the state of Alabama, and in conformity with the said act of Congress, and that the defendants in this cause were but the agents or agencies appointed and designated by the President of the United States for the construction of said plants solely by the government, and defendants allege that they acted in and about the construction of said plant solely as agents and agencies of the United States government, and under its direction and control. And defendants allege that at the time of plaintiff's injury, congressional legislation was the exclusive law of said place, and that the laws of the state of Alabama, which are invoked and sought to be enforced in this court, were not then in force at said place, and then had no application to said accidents or injuries or to the rights and remedies of the plaintiff."

Plaintiff interposed demurrers to the several pleas, which were overruled. All matters set out in the pleas are taken as true.

Appropriate provisions of section 8, article 1, of the Constitution of the United States, are:

"The Congress shall have power: * * * [Par. 17] To exercise *exclusive legislation* in all cases whatsoever, over such district (not exceeding ten miles square) as may, by cession of particular states, and the acceptance of Congress, become the seat of the government of the United States, and to *exercise like authority over all places purchased by the consent of the Legislature of the state* in which the same shall be, for the erection of forts, magazines, arsenals, dockyards, and other needful buildings; And [Par. 18] To make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this Constitution in the government of the United States, or in any department or officer thereof."

It is provided by sections 898, 899, of the Code of Alabama (1907) that—

[898] "The state of Alabama has ceded to the United States of America, jurisdiction over all lands which have been or may hereafter be purchased by the said United States in the state of Alabama, for the purpose of erecting thereon any armory, arsenal, fort, fortification, navy yard, custom house, lighthouse, post office, or public building of any kind whatever, and the Legislature of the State of Alabama has consented to all such purchases by said United States of America."

[899] "The jurisdiction ceded shall continue during the term the United States of America shall remain owner of the land so purchased, and shall be exclusive for all purposes except that the service of process issued out of the courts of the state of Alabama, shall not be prevented therein."

The act of Congress, approved June 3, 1916, sought to be embodied in plea 5, contained the following:

"The President of the United States is hereby authorized and empowered to make, or

cause to be made, such investigation as in his judgment is necessary to determine the best, cheapest, and most available means for the production of nitrates and other products for munitions of war and useful in the manufacture of fertilizers and other useful products by water power or any other power as in his judgment is the best and cheapest to use; and is also hereby authorized and empowered to designate for the exclusive use of the United States, if in his judgment such means is best and cheapest, such site or sites, upon any navigable or nonnavigable river or rivers or upon the public lands, as in his opinion will be necessary for carrying out the purposes of this act; and is further authorized to construct, maintain, and operate, at or on any site or sites so designated, dams, locks, improvements to navigation, power houses, and other plants and equipment or other means than water power as in his judgment is the best and cheapest, necessary or convenient for the generation of electrical or other power and for the production of nitrates or other products needed for munitions of war and useful in the manufacture of fertilizers and other useful products. The President is authorized to lease, purchase, or acquire, by condemnation, gift, grant, or devise, such lands and rights of way as may be necessary for the construction and operation of such plants, and to take from any lands of the United States, or to purchase or acquire by condemnation materials, minerals, and processes, patented or otherwise, necessary for the construction and operation of such plants and for the manufacture of such products." U. S. Comp. Stat. 1916, vol. 4, § 3110b, p. 4358.

[1] It must be admitted that the United States Nitrate Plant No. 2 was, on the date of this plaintiff's injury (June 18, 1918), a federal reservation upon which Congress had the right to assume and exercise exclusive legislation, and as such reservation was subject to the legislation by the state of Alabama making provision for cession of jurisdiction by sections 898 and 899 of the Code. The question then is whether Congress had assumed jurisdiction over said territory and legislated so as to exclude plaintiff from a remedy under the state statutes, or given him instead a remedy for his alleged injuries and wrongs on which the suit may be maintained in a federal forum. It is not questioned that the general rule is that where Congress may legislate on a given subject and has done so, criminally or civilly, such legislation is the supreme law of the land. See authorities collected in L. & N. R. Co. v. State, 16 Ala. App. 199, 76 South. 505, 510–514.

In Ft. Leavenworth R. Co. v. Lowe, 114 U. S. 525, 528, 5 Sup. Ct. 995, 997 (29 L. Ed. 264), Mr. Justice Field pointed out that no paramount authority having been granted by the state of Kansas to the federal government on the Ft. Leavenworth reservation, so located while the state was a territory, it was "necessary to obtain from the state of Kansas a cession of jurisdiction," and that the record failed to disclose that such application had ever been made to the state, and unqualified cession granted by it; that on February 22, 1875, the state Legislature passed an act to the effect:

" 'That exclusive jurisdiction be, and the same is hereby ceded to the United States over and within all the territory owned by the United States, and included within the limits of the United States military reservation known as the Ft. Leavenworth reservation in said state, as declared from time to time by the President of the United States, saving, however, to the said state the right to serve civil or criminal process within said reservation, in suits or prosecutions for or on account of rights acquired, obligations incurred, or crimes committed in said state, but outside of said cession and reservation; and saving further to said state the right to tax railroad, bridge, and other corporations, their franchises and property on said reservation.' Laws of Kansas 1875, p. 95."

The acceptance of the cession on the express terms of this state statute was presumed in the absence of any dissent on the part of the United States. Of the second part of the clause of the Constitution (article 1, § 8, par. 17), giving power to "exercise like authority," that is, exclusive legislation, "over all places purchased by the consent of the Legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dockyards, and other needful buildings," Justice Field said that the "Federalist observes that the necessity of this authority is not less evident." Continuing discussion of this salient provision of the federal Constitution he quoted from the Federalist thus:

"The public money expended on such places and the public property deposited in them require that they should be exempt from the authority of the particular state. Nor would it be proper for the places on which the security of the entire Union may depend to be in any degree dependent on a particular member of it. All objections and scruples are here also obviated by requiring the concurrence of the states concerned in every such establishment." "The power," said Mr. Justice Story, repeating the substance of Mr. Madison's language, "is wholly unexceptionable, since it can only be exercised at the will of the state, and therefore it is placed beyond all reasonable scruple."

Mr. Justice Field continued the discussion as follows:

"This power of exclusive legislation is to be exercised, as thus seen, over places purchased, by consent of the Legislatures of the states in which they are situated, for the specific purposes enumerated. It would seem to have been the opinion of the framers of the Constitution that, without the consent of the states, the new government would not be able to acquire lands within them; and therefore it was provided that when it might require such lands for the erection of forts and other buildings for the defense of the country, or the discharge of other duties devolving upon it, and the consent of the states in which they were situated was obtained

for their acquisition, such consent should carry with it *political dominion and legislative authority over them.* * * * The consent of the states to the purchase of lands, within them for the special purposes named is, however, essential, under the Constitution, to the transfer to the general government, with the title, of political jurisdiction and dominion. * * * When the title is acquired by purchase by consent of the Legislatures of the states, the federal jurisdiction is exclusive of all state authority. This follows from the declaration of the Constitution that Congress shall have 'like authority' over such places as it has over the district which is the seat of government; that is, the power of 'exclusive legislation in all cases whatsoever.' Broader or clearer language could not be used to exclude all other authority than that of Congress; and that no other authority can be exercised over them has been the uniform opinion of federal and state tribunals, and of the attorneys general. The reservation which has usually accompanied the consent of the states that civil and criminal process of the state courts may be served in the places purchased is not considered as interfering in any respect with the supremacy of the United States over them; but is admitted to prevent them from becoming an asylum for fugitives from justice. And Congress, · by statute passed in 1795, declared that cessions from the states of the jurisdiction of places where lighthouses, beacons, buoys, or public piers were or might be erected, with such reservation, should be deemed sufficient for the support and erection of such structures, and if no such reservation had been made, or in future cessions for those purposes should 'be omitted, civil and criminal process issued under the authority of the state or of the United States might be served and executed within them." (Italics supplied.) 1 Stat. 426, c. 40.

Appellant cites Chicago, R. I. & P. R. Co. v. McGlinn, 114 U. S. 542, 5 Sup. Ct. 1005, 29 L. Ed. 270. It will be observed that Ft. Leavenworth R. Co. v. Lowe, and the McGlinn Case were decided on the same date, the opinions being by the same justice. The Ft. Leavenworth Case was affirmed, and the general principle applied to the McGlinn Case, that when political jurisdiction and legislative power over a territory are transferred from one sovereignty to another, the municipal laws of the territory continue in force until abrogated by the new sovereign is applicable—as to territory owned by the United States, exclusive jurisdiction of which is ceded to the national government by a state in a manner not provided for by the Constitution—to so much thereof as is not used by the United States for its forts, buildings, and other needful public purposes. The state of Kansas, *by manner not provided for by the national Constitution,* ceded to the United States jurisdiction over the Ft. Leavenworth military reservation within that state, then and previously the property of or occupied by the United States; held, that at the time of the cession a state law of Kansas, requiring railroad companies, whose roads were not inclosed by a lawful fence, to pay to the owners of all animals injured the full value thereof, remained in force in the reservation after the cession, and that the state courts had jurisdiction of such action. In the McGlinn Case the learned justice said of Ft. Leavenworth R. R. Co. v. Lowe, supra:

"We there held that a building on a tract of land owned by the United States used as a fort, or for other public purposes of the federal government, is exempted, as an instrumentality of the government, from any such control or interference by the state as will defeat or embarrass its effective use for those purposes. But, in order that the United States may possess exclusive legislative power over the tract, except as may be necessary to the use of the building · thereon as such instrumentality, *they must have acquired the tract by purchase, with the consent of the state.* This is the only mode prescribed by the federal Constitution for their acquisition of exclusive legislative· power over it. When such legislative power is acquired *in any other way, as by an express act ceding it,* its cession may be accompanied with any conditions not inconsistent with the effective use of the property for the public purposes intended." (Italics supplied.)

The acquisition of Ft. Leavenworth, as pointed out in the Lowe Case, was by express act of cession (February 22, 1875, Laws of Kansas 1875, p. 95) on conditions therein contained, and not by purchase in manner provided by the Constitution; and it was held that the reservations in the act of cession were not inconsistent with the effective use of the property for the public purposes intended and to which it was subject by the government.

In Benson v. United States, 146 U. S. 325, 13 Sup. Ct. 60, 36 L. Ed. 991 (error to the Circuit Court of the United States for the District of Kansas), where plaintiff in error had been tried and convicted in the Circuit Court of the United States of murder, charged to have been committed on the Ft. Leavenworth military reservation, it was announced that the Constitution permits a state to cede to the United States jurisdiction over a portion of its territory, and that the United States has exclusive jurisdiction over the entire Ft. Leavenworth reservation in Kansas, except as was reserved to the state of Kansas by the act of cession. Of this the Justice said:

"It is contended by appellant's counsel that within the scope of those decisions, jurisdiction passed to the general government only over such portions of the reserve as are actually used for military purposes, and that the particular part of the reserve on which the crime charged was committed was used solely for farming purposes. But in matters of that kind the courts follow the action of the political department of the government. The entire tract had been legally reserved for military purposes. United States v. Stone, 2 Wall. 525, 537. The character and purposes of its occupation having been officially and legally established by that

branch of the government which had control over such matters, it is not open to the courts, on a question of jurisdiction, to inquire what may be the actual uses to which any portion of the reserve is temporarily put. There was therefore jurisdiction in the Circuit Court; and the first contention of plaintiff in error must be overruled."

Mr. Justice Holmes pursued the same inquiry in Battle v. United States, 209 U. S. 36, 37, 28 Sup. Ct. 422, 423 (52 L. Ed. 670), where the crime for which prosecution was had in the United States court was committed upon land bought by the United States in the city of Macon, on which the government was building a courthouse and post office, and over which the state of Georgia had ceded jurisdiction, without qualification or reservation, as was done in the Ft. Leavenworth reservation. The Justice said:

"There can be no doubt of the power of Congress to purchase land within a state for post offices or courts, by consent of the Legislature of the state, and to exercise exclusive legislation over the same. Post offices are among the 'other needful buildings' for the erection of which, as well as of 'forts magazines, arsenals, dockyards,' it is assumed that land will be bought, and for which land has been bought by the government all over the United States. Const. art. 1, § 8, cl. 17. Indeed, this is not denied. The power to establish post offices is given by article 1, § 8, cl. 7, in terms. See Kohl v. United States. 91 U. S. 367, 372; Burt v. Merchants' Insurance Co., 106 Mass. 356; Trombley v. Humphrey, 23 Mich. 471, 475; Sinks v. Reese, 19 Ohio St. 306. The exclusive legislative power and jurisdiction of the United States is equally clear. Ft. Leavenworth R. R. Co. v. Lowe, 114 U. S. 525; Benson v. United States, 146 U. S. 325."

In response to writ of error to the Supreme Court of Appeals of the state of Virginia, in Western U. Tel. Co. v. Chiles, 214 U. S. 274, 278, 29 Sup. Ct. 613, 614 (53 L. Ed. 994), Mr. Justice Moody propounds the inquiry whether a law of the state of Virginia, imposing a penalty for nondelivery of a telegram, has any effect or operation within the limits of the navy yard. Answering, he says:

"By the refusal to give the instruction requested the jury in effect was permitted to find for the plaintiff, even if the default was entirely within the navy yard. We think this was clearly erroneous. By the terms of the Constitution, Congress is given the power 'to exercise exclusive legislation in all cases whatsoever * * * over all places, *purchased by the consent of the Legislature of the state in which the same shall be*, for the erection of forts, magazines. arsenals, dockyards and other needful buildings.' Article 1, § 8, par. 17, of the Constitution. It is apparent from the history of the establishment of the Norfolk Navy Yard, already given [that of purchase and unconditional conveyance by deed of state to the government of date June 15, 1801, authorized by an act of the assembly passed January 25, 1800], that it is one of the places where the Congress possesses exclusive legislative power. It follows that the laws of the state of Virginia, with the exception referred to in the acts of assembly, cannot be allowed any operation or effect within the limits of the yard. The exclusive power of legislation necessarily includes the exclusive jurisdiction. The subject is so fully discussed by Mr. Justice Field, delivering the opinion of the court in Fort Leavenworth R. R. Co. v. Lowe, 114 U. S. 525, that we need do no more than refer to that case and the cases cited in the opinion."

In Gromer, Treas. of Porto Rico, v. Standard Dredging Co., 224 U. S. 362, 369, 32 Sup. Ct. 499, 502 (56 L. Ed. 801)—a decision not apt to the instant case—the question was whether the act of the Legislative Assembly of Porto Rico, providing that an injunction may issue to prevent collection of illegal tolls, applies to the District Court of the United States for Porto Rico; and it was pointed out that the purpose of the Foraker Act (31 Stat. 77) was to give local self-government to Porto Rico, reserving to the United States rights to the harbor areas and navigable waters for the purpose of exercising jurisdiction over commerce and navigation. Held that, while the United States can reserve control over such places as it sees fit within a territory to which it gives autonomy, it does not reserve any such places unless it is so expressed in the act. The Justice observes:

"The distinction made between local control of property and the exercise of government is a substantial one, and is illustrated in cases. Shively v. Bowlby, 152 U. S. 1, 30; Thomas v. Gay, 169 U. S. 264; Ft. Leavenworth R. R. Co. v. Lowe, 114 U. S. 525; Id. 542; Western Union Telegraph Co. v. Chiles, 214 U. S. 274, 278; Reynolds v. People, 1 Colo. 179, 181; Scott v. United States, 1 Wyo. 40; Territory v. Burgess, 8 Mont. 57."

The opinion of the New York Court of Appeals in Barrett v. Palmer, 135 N. Y. 336, 31 N. E. 1017, 17 L. R. A. 720, 31 Am. St. Rep. 835, was affirmed in 162 U. S. 399, 16 Sup. Ct. 837, 40 L. Ed. 1015, Mr. Justice White stating that, in view of the reservation of jurisdiction made by the state of New York by the act ceding to the United States jurisdiction over lands adjacent to the navy yard and hospital in Brooklyn, the exclusive authority of the United States over the land covered by the lease, the ouster from possession under which is the subject of controversy in the action, was suspended while the lease remained in force. The power of the state to impose conditions in the act of cession was said to be beyond question; it not being a case where exclusive legislative authority is rested by the Constitution of the United States. That is to say, in the language of the Lowe Case, the cession could be accompanied with such conditions as the state might see fit to annex, not inconsistent

with the free and effective use of the fort as a military post.

Resident inmates and employés of the Soldiers' Home near Johnson City, Tenn., for disabled volunteers of the United States army, are held not to be citizens of the state of Tennessee, and are not legal voters at elections in that state, for the reason that the United States has exclusive jurisdiction over the land on which said home is located. State ex rel. Lyle v. Willett, 117 Tenn; 334, 345, 97 S. W. 299. The cession of the land on which the soldiers' home is located was by legislation providing that all process issued under the authority of Tennessee may be executed on said lands in the same manner as if its jurisdiction had not been ceded. The Justice said, in Divine, Adm'r, v. Unaka Nat. Bank, 125 Tenn. 98, 140 S. W. 747, 36 L. R. A. (N. S.) 586, of the probate jurisdiction of the soldiers' home in Tennessee:

"Where land within a state is acquired by the United States, with the consent of a state, then under article 1, § 8, subsec. 17, of the federal Constitution, the jurisdiction of the United States is complete and exclusive, and the reservation contained in such grants to the effect that the state shall have the right to serve civil and criminal process within the territory ceded, is limited to causes of action arising outside of the ceded territory; the purpose of such reservation being to prevent the territory's becoming an asylum for fugitives from justice. This must be understood and applied, however, in the light of the principle of public law that, when the new sovereign has not provided legislation for the territory so acquired, the laws of the former sovereign continue in force so far as needed for the protection and enforcement of the municipal or private rights of individuals residing within the territory. * * * It is said that court jurisdiction is necessarily dependent upon the legislative power of the sovereign under whose authority the court was constituted, and that when the latter ceases the former must fail with it. This is in general true, but an exception must be recognized when the new sovereign, out of deference to the principle of public law above referred to, recognizes the continued existence within the particular territory of the laws of the former sovereign. Those laws cannot be made effective, except through the aid of a court. The federal courts have no jurisdiction, except that conferred by the Constitution or by an act of the Congress. United States v. Hudson, 7 Cranch, 32, 3 L. Ed. 259; Turner v. Bank of North America, 4 Dall. 8, 1 L. Ed. 718; United States v. Bevans, 3 Wheat. 337, 4 L. Ed. 404. * * * To apply these principles to the facts of the present case: The federal courts have been given no probate powers, by the Congress, or authority to appoint an administrator of a decedent. * * * Therefore this power remains with the state courts."

In Foley v. Shriver, 81 Va. 568, 574, as to the legal status of residents of the National Home for Disabled Volunteer Soldiers in Elizabeth City county, in the state of Virginia, the court said:

"In this case, the state Legislature having given the required consent, and the United States having *purchased the land in question*, the United States have acquired, under the federal Constitution, exclusive jurisdiction over the ceded lands, and they are no longer a part of the state of Virginia, and are not subject to the jurisdiction of the state courts. Persons residing there are not citizens of Virginia; the property situated there is not subject to the control or disposal of any state court, and the circuit court of Elizabeth City county is without jurisdiction within the said territory."

In Bank of Phoebus v. Byrum, 110 Va. 708, 67 S. E. 349, 27 L. R: A. (N. S.) 436, 135 Am. St. Rep. 953, the Virginia court held that the mere fact that the state has the right to serve process in the territory ceded to the United States for a soldiers' home, the title to the property being acquired by purchase under the Constitution, does not affect the personal status of a resident of such reservation so as to defeat the right of a creditor to attach his property in the state on the ground that he is a nonresident coming from another state to the reservation at Fortress Monroe, where cession by the General Assembly of Virginia was "for all purposes except the service * * * of * * * process of the courts."

It is held that where a state has given consent to the purchase of lands by the United States under the Constitution, the legislative power of Congress over the lands purchased is exclusive, and the state has no power under existing laws of the state to license the traffic in liquors on said premises; the reservation being that on which are located Plattsburg Barracks. Farley v. Scherno, 208 N. Y. 269, 271, 101 N. E. 891, 47 L. R. A. (N. S.) 1031.

An assault and battery, committed in the power house on the military reservation at Sandy Hook, held not subject to prosecution in the state courts of New Jersey, the government having, under the Constitution, acquired by purchase the lands for a lighthouse, and after its cession to the United States by the Legislature of that state, Congress enacted a law for the punishment of such offense; held that the legislation was an exercise of the power conferred by the Constitution with reference to the land so purchased and ceded, that the jurisdiction of the federal courts became exclusive, and that the state courts were without jurisdiction to try the case. State of New Jersey v. Morris, 76 N. J. Law, 222, 68 Atl. 1103.

The case of Dahn v. McAdoo (D. C.) 256 Fed. 549, cited by appellant, held that the federal Employés Compensation Act (U. S. Comp. St. §§ 8932a–8932uu) did not provide an exclusive remedy so as to preclude a railway mail clerk from maintaining an action for personal injury against the Director General of Railroads, pursuant to general order No. 50; and is not in point.

Appellant cites Madden v. Arnold, 22 App. Div. 240, 47 N. Y. Supp. 757, where the action was for damages for personal injuries inflicted by a vicious dog on land purchased by the United States, and over which the Legislature of New York had ceded jurisdiction, for the purpose of erecting and maintaining thereon arsenals, magazines, dockyards, and other necessary buildings. The Justice cited the McGlinn and Ft. Leavenworth Cases, saying that he saw no reason to doubt that the action could be maintained in the Supreme Court of the state since Congress had not provided for such action, and further that—

"As we have seen, Congress has legislated as to crimes committed in its forts, arsenals, and territory. It has by law prescribed the punishment for crimes committed therein, and the courts before which criminals shall be tried. Congress having thus established a criminal code for its forts, arsenals, and territory, the criminal laws of the state in which such territory is situate cease to operate therein." Kaufman v. Hopper, 151 App. Div. 28, 135 N. Y. Supp. 363; Barrett v. Palmer, 135 N. Y. 336, 31 N. E. 1017, 17 L. R. A. 720, 31 Am. St. Rep. 835.

[2-4] That Congress assumed jurisdiction over the reservation at Muscle Shoals, at Sheffield, where plaintiff's injuries occurred, and proceeded with the construction of the nitrate plant, is a matter of common knowledge. Congress also enacted federal Employés Compensation Act (U. S. Comp. Stat. 1916, vol. 8, p. 9780, c. D. §§ 8932a–8932uu); and we take judicial knowledge of the fact that the Employés' Compensation Commission in this act has declared the employés of the United States Nitrate Plant No. 2 to be federal employés within the contemplation of the Compensation Act, and that such action of the department of government in prosecution of the war work is within the judicial knowledge of this court. Lawrenceburg Roller Mills Co. v. Chas. A. Jones & Co., 85 South. 719.[2] The following are pertinent orders and decisions of the commission:

"The commission, after an examination of the agency contract made by the ordnance department of the army with the Air Nitrates Corporation for the construction of a plant at Muscle Shoals, Ala., decided that the employés of the corporation itself engaged in the work at Muscle Shoals are civil employés of the United States, and entitled to the benefits of the Compensation Act. The corporation was so notified, but at the same time informed that the ruling did not apply to employés of subcontractors, and that their status could not be determined by the commission without having the subcontracts before it."

"The commission examined the following contracts and held them to be agency contracts, and the employés under same to be entitled to the benefits of the Compensation Act. It was further held that since the contractor had not carried insurance in any form the decision of the commission is retroactive to date of signing the contract.

"Contract dated November 17, 1917, between Westinghouse, Church, Kerr & Co., Incorporated, and the Air Nitrates Corporation, for the construction of plant for the manufacture of ammonium nitrate at Muscle Shoals, Ala., and certain engineering work in connection therewith.

"Contract dated November 17, 1917, between the J. G. White Engineering Corporation, and the Air Nitrates Corporation, for the construction of plant for the manufacture of ammonium nitrate at Muscle Shoals, Ala., and certain engineering work in connection therewith."

We are of opinion that the judgment of the circuit court was without error, and it is affirmed.

ANDERSON, C. J., and McCLELLAN and SOMERVILLE, JJ., concur.