## MOUNTAIN PRODUCERS CORPORATION v. COMMISSIONER OF INTERNAL REVENUE.*

### No. 1516.

Circuit Court of Appeals, Tenth Circuit.

Aug. 26, 1937.

Harold D. Roberts, of Denver, Colo. (Randolph E. Paul and Valentine B. Havens, both of Washington, D. C., on the brief), for petitioner.

Helen R. Carloss, Sp. Asst. to Atty. Gen. (James W. Morris and Sewall Key, both of Washington, D. C., on the brief), for respondent.

Before PHILLIPS and BRATTON Circuit Judges, and KENNEDY, District Judge.

KENNEDY, District Judge.

The Board of Tax Appeals upon an appeal from the Commissioner of Internal Revenue assessed a deficiency tax against the petitioner for the year 1925 in the amount of $67,509.13 and the matter is here upon a petition for a review of the Board's decision. The facts were stipulated before the Board and a brief summary of its findings will suffice in determining the applicable principles of law.

In 1925 the petitioner, Mountain Producers Corporation, owned all of the capital stock of the Wyoming Associated Oil Corporation, and a consolidated return was filed upon which the deficiency in controversy was determined. The Wyoming Corporation, organized in 1919, held certain placer mining claims, leases, and operating agreements in the Salt Creek Oil Field in Natrona County, Wyo. After the passage of the Oil and Gas Leasing Act of February 25, 1920, 41 Stat. 437, its claims were exchanged for Government leases and later exchanges were made with the Mid-

*Writ of certiorari granted 58 S.Ct. 409, 82 L.Ed. ——.

west Oil Company and the Wyoming Oil Fields Company for the purpose of consolidating the leaseholds into more compact blocks to decrease the necessity for offset drilling. On February 1, 1923, the Wyoming Associated entered into a contract with the Midwest Refining Company whereby it agreed to sell to the Refining Company all the oil produced by it in the Salt Creek Oil Field, and the Refining Company agreed to purchase such oil until January, 1934, which contract provided for a sliding scale of prices to be paid for such oil. It was also provided that as a part of the price for the oil purchased under said contract the Refining Company should drill, case, and maintain all wells, find and supply water, install and operate pumps when necessary, clean, shoot, and otherwise stimulate production, conduct all development and production operations necessary for the protection and conservation of the oil and gas contained therein. It was further provided that the Wyoming Company should give to the Refining Company free use of all storage facilities, pipe lines, buildings and equipment, and free of charge all oil and gas necessary for drilling operations, and that the Refining Company should take delivery of the oil purchased at the outlet gates of the measuring tanks located at or near the wells on the property.

On the same date, February 1, 1923, the Wyoming Associated Oil Corporation and the Midwest Oil Company as the holder of a certain lease from the state of Wyoming which originated in October, 1919, covering all of section 36, township 40 north of range 79 west, entered into an agreement by which the Midwest Oil Company was to hold in trust for the benefit of Wyoming Associated an undivided 50 per cent. interest in the state lease and in the benefits and net proceeds realized therefrom and from all renewals and extensions thereof, whether such renewals or extensions should be made in the name of the Wyoming Company or in their joint names. The lease from the state of Wyoming to the Midwest Oil Company under date of April 19, 1923, presently involved, covered school lands which had been at the time of the admission of Wyoming to the Union turned over and granted to the state for the benefit of its public schools and provided that the lessee should pay to the state a royalty equal to 65 per cent. of the market value of the oil and gas at the mouth of the wells, or at the option of the state to deliver the equivalent amount of the oil and gas produced. In its execution the oil in kind was taken by the state. The cash payments received as net proceeds of its properties by the Wyoming Associated from the Midwest Refining Company for the year 1925 were $4,606,535.70, and the cost of production by the Refining Company of the oil produced to realize this sum was $2,816,520.04. The net amount received by the Wyoming Associated for the lease of the state school lands under the trust agreement from the Midwest Oil Company was $185,438.83.

The questions arising under the aforesaid situation are twofold: (1) What is the gross income upon which the depletion allowance of the Wyoming Associated as the petitioners' affiliate should be determined? And (2) is the amount which the Wyoming Associated received under the trust agreement with the Midwest Oil Company from its oil and gas lease with the state of Wyoming exempt from tax?

The applicable statute concerning depletion allowance is the Revenue Act of 1926, § 204 (c) (2), 44 Stat. 14, reading as follows: "In the case of oil and gas wells the allowance for depletion shall be 27½ per centum of the gross income from the property during the taxable year. Such allowance shall not exceed 50 per centum of the net income of the taxpayer (computed without allowance for depletion) from the property, except that in no case shall the depletion allowance be less than it would be if computed without reference to this paragraph."

The petitioner contends that the gross income from its properties during the taxable year consisted of the total cash payments, plus the cost of production by the Refining Company under its contract providing that the production costs should be a part of the purchase price of the oil, but the Board of Tax Appeals determined otherwise and limited the gross income to the cash payments received.

Counsel admit that there are no cases on all fours with the case at bar. The respondent relies strongly upon the case of Helvering v. Twin Bell Syndicate, 293 U.S. 312, 55 S.Ct. 174, 79 L.Ed. 383, where the point involved the inclusion of cash royalty payments as gross income for the purpose of fixing depletion allowance. It was there held that such royalty payments should be excluded from the gross income. It is apparent, however, from the reading of this decision that it involved a different

principle than that now before us. The royalty owners themselves were entitled to the depletion allowance as well as the lessee. The pertinent language is found on page 321 of 293 U.S., 55 S.Ct. 174, 178, 79 L.Ed. 383: "At all events, as the section must be read in the light of the requirement of apportionment of a single depletion allowance, we are unable to say that the Commissioner erred in holding that for the purpose of computation 'gross income from the property' meant gross income from production less the amounts which the taxpayer was obliged to pay as royalties. The apportionment gives respondent 27½ per cent. of the gross income from production which it had the right to retain and the assignor and lessor respectively 27½ per cent. of the royalties they receive. Such an apportionment has regard to the economic interest of each of the parties entitled to participate in the depletion allowance."

A case more applicable in principle to the determination of our question is Boulton v. Heiner (D.C.) 3 F.Supp. 372. The court there was confronted with the matter of determining whether or not the value of services under contract should be included with cash payments in fixing the cost of stock for the purpose of ascertaining the profit from a sale thereof. The court says, at page 374 of 3 F.Supp.: "The plaintiff claims in the present suit that in addition to the amount of money actually paid by him for the stock in question in order to acquire it, he was compelled by his contract with the other incorporators and with the original owners of the properties taken over by the corporations, to expend labor and effort which was worth at least the sum of $17,500. The uncontradicted testimony shows that this service was agreed upon and rendered; that it was worth $17,500; and that plaintiff received no compensation therefor other than by the right to acquire the stock. Under these circumstances it is our opinion that the plaintiff is entitled to claim that the cost of his stock was not merely $11,500, the amount of money paid, but also $17,500, the value of his services rendered pursuant to his agreement."

■ We see no just or logical reason why the cost of production of the oil here which was made a part of the purchase price should not be added to the cash payments for the purpose of determining the gross income of the Wyoming Associated. Certainly it should be unless pure technicalities of the taxing laws be invoked. Had the Wyoming Company produced the oil at its own expense, its gross income would have been the amount which it received from the oil sold and the only difference would have been that it would have received in cash the proportionate amount which represented the cost of production. Under such conditions there should be no question of its gross income including the oil produced and sold to cover production costs. It cannot logically be less than an element of gross income because the cost of production by another is a component part of the purchase price of the oil. There is no criticism on the part of the Government either as to the fairness of the purchase price or of the cost of production covered by the contract between the Wyoming Associated and the Midwest Refining and therefore it would seem unnecessary to analyze these schedules; nor can any charge be made that there was any effort on the part of the taxpayer to enter into a contract for the purpose of favorably affecting its tax liability.

■ The respondent contends that the adoption of the petitioner's theory would result in the allowance of a double deduction in that if the cost of production should be included as gross income it would be deducted as an expense, while under the head of depletion the appropriate percentage of the amount would be deducted a second time. We cannot see the soundness of this theory. If the Wyoming Associated operated its own properties and produced its oil which it sold for cash, the cost of that production would be deducted as of course in arriving at its net income for taxation purposes; but if it produced the oil which it sold where a part of the proceeds were necessarily used to cover the cost of production, its gross income would be the total amount sold for the purpose of computing depletion allowance. The two matters are clearly distinct, one being the determination of net income and the other depletion allowance and are approached by the taxing statutes from entirely different angles. We think that the Board erred in excluding, the cost of production which was a part of the purchase price of the oil, from the gross income of the petitioner's affiliate.

With reference to the second question, the Board held that the amount received by the petitioner's affiliate from the net proceeds of the school lease under its trust agreement with the lessee of the state was

not exempt from tax. It may be admitted that the decisions of the Supreme Court place cases of this character upon the border line. The members of the court have been far from unanimous in their views in the more recent cases. In Metcalf & Eddy v. Mitchell, 269 U.S. 514, at page 522, 46 S.Ct. 172, 174, 70 L.Ed. 384, Mr. Justice Stone in speaking for the court says: "Just what instrumentalities of either a state or the federal government are exempt from taxation by the other cannot be stated in terms of universal application. But this court has repeatedly held that those agencies through which either government immediately and directly exercises its sovereign powers, are immune from the taxing power of the other."

In Burnet, Commissioner, v. Coronado Oil & Gas Co., 285 U.S. 393, 52 S.Ct. 443, 76 L.Ed. 815, it was held that the lands granted by the United States to the state of Oklahoma for the support of common schools, where leased by the state to a private company for the extraction of oil and gas, the state reserving a part of the gross production for the benefit of its public school fund, the lease was an instrumentality of the state and the application of a federal income tax derived from the lease by the lessee was unconstitutional. It is true that in Burnet, Commissioner, v. A. T. Jergins Trust, 288 U.S. 508, 53 S.Ct. 439, 77 L.Ed. 925, it was held that under an oil and gas lease made by a city to a private party the receipts of the lessee were not exempt from a federal tax because the subject taxed was remote from any governmental function and the collection of the tax did not trench upon the immunity of the state as a sovereign. In the opinion, however, the court distinguishes the Coronado Case and the case of Gillespie v. Oklahoma, 257 U.S. 501, 42 S.Ct. 171, 66 L.Ed. 338, by the statement that the burden upon the public was there more definite and direct than in the case under consideration. We think that the Coronado Case, which has been criticized but never overruled, must through analogy rule the case at bar, unless the situation of the Wyoming Associated is distinguishable from that of the lessee. Such a contention is made by the respondent through reference to the cases of Wanless Iron Co. v. Commissioner, 75 F.(2d) 799 (C.C.A. 8), and Hobart Iron Co. v. Commissioner, 83 F.(2d) 25 (C.C.A. 6). Those cases were distinguished from the Coronado and Gillespie Cases, however, upon the ground that sublessees could not claim exemption from tax since the lessee had parted with any direct relationship with the state.

In the case at bar we find the lessee and the taxpayer bound together by a trust agreement entered into before the lease by the state was made by which they were to have equal rights in the lease itself and the net proceeds realized from it in whichever name of the parties the lease or any renewal or extension should stand. In substance and effect the Wyoming Associated was as much a lessee of the lands as was the Midwest Oil Company, the lessee in name. In Central Life Assurance Society v. Commissioner (C.C.A.) 51 F.(2d) 939, at page 941, it was said: "Tax laws are essentially practical in their purposes and application, and the federal income tax laws are no exception. While, for purposes of convenience and certainty in collection of such taxes, it is sometimes provided that those who collect income for others shall pay therefrom the taxes thereon, yet a cardinal purpose of the income tax laws is to tax the income to the person who has the right or beneficial interest therein, and not to throw the burden upon a mere collector or conduit through whom or which the income passes. Shellabarger v. Commissioner, 38 F.(2d) 566, 567 (C.C.A. 7); Young v. Gnichtel, 28 F.(2d) 789 (D.C.N.J.); O'Malley-Keyes v. Eaton, 24 F.(2d) 436 (D.C.Conn.); also compare U.S. v. Robbins, 269 U.S. 315, 327, 328, 46 S.Ct. 148, 70 L.Ed. 285; Kaufmann v. Commissioner, 44 F.(2d) 144, 146 (C.C.A. 3); Mitchel v. Bowers, 15 F.(2d) 287, 289 (C.C.A. 2). It is also a basic principle in the application of such laws that substance and not mere form be regarded as governing."

Many cases are cited in the briefs in addition to those to which reference herein has been made, but we think they fail to throw any additional light upon the subject under discussion and therefore have not been reviewed.

For the reasons stated, the decision of the Board of Tax Appeals upon both points will be reversed, and the case remanded for further proceedings in accordance with this opinion.

PHILLIPS, Circuit Judge (dissenting).

The declaration of trust of February 1, 1923, in part, read:

"Whereas The Midwest Oil Company, a corporation of the State of Arizona, is the holder of a certain lease from the

State of Wyoming, dated the 1st day of October, 1919,[1] and

"Whereas The Wyoming Associated Oil Corporation, a corporation of the State of Delaware, is entitled to receive the undivided share in the benefits and net proceeds realized by The Midwest Oil Company under said lease and all renewals and extensions thereof, as hereinafter set forth;

"Now, Therefore, In consideration of the premises and in consideration of other good and valuable considerations paid to The Midwest Oil Company by the Wyoming Associated Oil Corporation, said The Midwest Oil Company doth hereby declare that it holds an undivided fifty per cent. (50%) interest in said lease and in the benefits and net proceeds to be realized therefrom and all renewals and extensions thereof for the use and benefit of said The Wyoming Associated Oil Corporation, and reserves the beneficial interest in the remaining fifty per cent. (50%) thereof to itself."

The contract of February 1, 1923, in part, read:

"This Agreement Made as of the First day of February, A. D. 1923, between The Midwest Oil Company, a corporation of the State of Arizona, and Wyoming Oil Fields Company, a corporation of the State of Wyoming, and The Wyoming Associated Oil Corporation, a corporation of the State of Delaware, parties of the first part, hereinafter called the 'Producing Companies,' and The Midwest Refining Company, a corporation of the State of Maine, party of the second part, hereinafter called the 'Refining Company'; Witnesseth:

"Whereas The Producing Companies among them own in the several fractions hereinafter set forth leases covering the following described lands in the Salt Creek Oil Field, Natrona County, Wyoming, to-wit: * *

"The so-called 'State School Lease,' * * held in trust by the Midwest Oil Company for the benefit of The Midwest Oil Company to the extent of an undivided 50 per cent interest and for the benefit of The Wyoming Associated Oil Corporation to the extent of an undivided 50 per cent. interest."

The lease of April 19, 1923 from the state of Wyoming to the Midwest Oil Company covering the school section provided that it should not be assigned without the consent and approval of the state. The record does not disclose the consent or approval by the state of any assignment of an interest in the lease to Associated Oil Corporation. It seems to me when regard is had for the substance of the transactions, what Associated Oil Corporation really acquired was a right to share equally with the Midwest Oil Company in the net profits, if any, derived from the operation of the lease. The right to manage and operate the lease was vested wholly in the Midwest Oil Company. It alone contracted with the state. The state looked to it alone for the performances of the covenants of the lease. If there were no net profits, Associated Oil Company acquired nothing and it was not expressly obligated to contribute to any losses. The tax was laid upon the net profits after they were segregated and divided between the Associated Oil Corporation and the Midwest Oil Company.

Under these circumstances, was the one-half of the net profits, when segregated and paid to the Associated Oil Corporation, immune from federal taxation? The immunity from taxation accorded to governmental instrumentalities is for the protection of the government in its exercise of governmental functions and extends no further than is necessary for that purpose. Indian Territory Illuminating Oil Company v. Board of Equalization, 288 U.S. 325, 327, 53 S.Ct. 388, 77 L.Ed. 812. The effect of the decisions since Gillespie v. Oklahoma, 257 U.S. 501, 42 S.Ct. 171, 66 L.Ed. 338, has been to restrict rather than to extend this doctrine of immunity. In Burnet v. Coronado O. & G. Co., 285 U.S. 393, 398, 52 S.Ct. 443, 444, 76 L.Ed. 815, the court said:

"We are disposed to apply the doctrine of Gillespie v. Oklahoma strictly and only in circumstances closely analogous to those which it disclosed."

In Fox Film Corp. v. Doyal, 286 U.S. 123, 128, 52 S.Ct. 546, 547, 76 L.Ed. 1010, the court said:

"The principle of the immunity from state taxation of instrumentalities of the federal government, and of the corresponding immunity of state instrumentalities from federal taxation—essential to the maintenance of our dual system—has its inherent limitations. It is aimed at the protection of

---

[1] The school section lease.

the operations of government (McCulloch v. Maryland, 4 Wheat. 316, 436, 4 L.Ed. 579), and the immunity does not extend 'to anything lying outside or beyond governmental functions and their exertion.' (Indian Motocycle Co. v. United States, 283 U.S. 570, 576, 579, 51 S.Ct. 601, 603, 75 L.Ed. 1277). Where the immunity exists, it is absolute, resting upon an 'entire absence of power' (Johnson v. Maryland, 254 U.S. 51, 55, 56, 41 S.Ct. 16, 65 L.Ed. 126), but it does not exist 'where no direct burden is laid upon the governmental instrumentality, and there is only a remote, if any, influence upon the exercise of the functions of government.' (Willcuts v. Bunn, 282 U.S. 216, 225, 51 S.Ct. 125, 127, 75 L.Ed. 304 [71 A.L.R. 1260])."

See, also, Helvering v. Atlas Life Insurance Co. (C.C.A. 10) 78 F.(2d) 166, 168; Taber v. Indian Territory I. O. Co., 300 U.S. 1, 3, 4, 57 S.Ct. 334, 81 L.Ed. 463.

In Jaybird Mining Co. v. Weir, County Treasurer, 271 U.S. 609, 46 S.Ct. 592, 593, 70 L.Ed. 1112, an attempt was made to lay an ad valorem tax upon ores mined under a lease of restricted Indian land and in the bins on the land. A tax was assessed on the ores in mass, the royalties or equitable interest of the Indians not having been paid or segregated. The court said: "The lessee is an agency or instrumentality employed by the government for the development and use of the restricted land and to mine ores therefrom for the benefit of its Indian wards," and held that the tax was laid upon a federal governmental instrumentality. However, in the later case of Indian Territory I. O. Co. v. Board of Equalization, 288 U.S. 325, 53 S.Ct. 388, 389, 77 L.Ed. 812, where an ad valorem tax was laid upon the lessee's share of the ore produced under a restricted Indian lease after the royalties or equitable interests of the Indian lessors had been segregated and paid to them, immunity was denied. In the latter case the court said:

"There is a recognized distinction between a non-discriminatory tax upon the property of an agent of government, albeit the property is used in, or has relation to, the business of the agency—where there is only a remote, if any, influence upon the exercise of the functions of government— and a tax which is deemed to impose a direct burden upon the exertion of governmental powers." [2]

In Burnet v. A. T. Jergins Trust, 288 U. S. 508, 53 S.Ct. 439, 440, 77 L.Ed. 925, the city of Long Beach, California, made an oil and gas lease to the Jergins Trust covering part of a tract of land owned by the city and used by it for water supply and other purposes. Under the lease the oil and gas recovered was jointly sold by the parties to the lease and the proceeds were divided in stated proportions between them. The Commissioner of Internal Revenue proposed a deficiency in income taxes on account of the proceeds derived by the Jergins Trust from the sale of oil. The Jergins Trust asserted that the income was immune from taxation. The court said:

"If the respondent is exempt from the exaction, the conclusion must follow, because the tax directly burdens the functions of the state acting through the city of Long Beach. Considerations which have led to the condemnation of taxes in other circumstances are here absent. The levy is not upon the property of the municipality, nor upon the income it derives from its property, is not upon the city's share of the oil recovered, the lease, or the gross income therefrom. The law measures the assessment by the net income of the respondent, whose operations are carried on in a private, and not in a public, capacity for the personal gain of its cestuis que trust. The government asserts that the incidence of the tax is so remote from the activities of the municipality as to have no substantial adverse effect upon them. The respondent insists that as lessee of the lands in question it is a governmental agency, and any tax laid upon its income directly burdens governmental functions. * * *

"The application of the doctrine of implied immunity must be practical (Union P. Railroad Co. v. Peniston, 18 Wall. 5, 31, 36, 21 L.Ed. 787), and should have regard to the circumstances disclosed. We think that in the present instance the subject of the tax is so remote from any governmental function as to render the effect of the exaction inconsiderable as respects the activities of the city. Compare Alward v. Johnson, 282 U.S. 509, 514, 51 S.Ct. 273, 75 L.Ed. 496, 75 A.L.R. 9. Its collection is not inconsistent with and does not trench upon the immunity of the state as a sovereign. The income of the respondent from the lease is not immune from federal income tax."

[2] See discussion of these cases in Taber v. Indian Territory I. O. Company, 300 U.S. 1, 4, 5, 57 S.Ct. 334, 81 L.Ed. 463.

84

It has been held that the income derived by a sub-lessee under, or an assignee of a mineral lease from a state of lands owned by the state, is not immune from taxation although the sub-lessee or assignee is required by the terms of the lease to perform the obligations of the lessee under the original lease from the state. Helvering v. Atlas Life Ins. Co. (C.C.A. 10) 78 F.(2d) 166; Hobart Iron Co. v. Commissioner (C.C.A. 6) 83 F.(2d) 25, certiorari denied 299 U.S. 543, 57 S.Ct. 26, 81 L.Ed. 400; Wanless Iron Co. v. Commissioner (C.C.A.8) 75 F.(2d) 779 Cert. denied 295 U.S. 765, 55 S.Ct. 924, 79 L.Ed. 1706. Here the Associated Oil Company had no direct contractual relation with the state. Its right under the contracts with the Midwest Oil Company was to share in the net proceeds of the lease. The tax was laid upon the Associated Oil Company's share of the net proceeds of the lease after they had been segregated and divided.

It is my opinion that the incidence of the tax is so remote in its influence or effect upon the exercise by the state of its governmental functions as to have no substantial adverse effect upon them. I, therefore, respectfully dissent from so much of the majority opinion as holds that the net proceeds derived by the Associated Oil Company under the declaration of trust of February 1, 1923 are immune from taxation by the federal government. In all other respects I concur in the majority opinion.