## UNITED STATES v. BOARD OF COM'RS OF FREMONT COUNTY, WYO., et al.

### Civil Action No. 2878.

District Court, D. Wyoming.

Dec. 31, 1943.

Carl L. Sackett, U. S. Atty., and John C. Pickett, Asst. U. S. Atty., both of Cheyenne, Wyo., for plaintiff.

L. A. Crofts, Co. and Pros. Atty., of Lander, Wyo., and John U. Loomis and Edward T. Lazear, both of Cheyenne, Wyo., for defendants.

KENNEDY, District Judge.

This is a suit by the United States against the County Commissioners, County Treasurer and County Assessor of Fremont County to quiet title to certain Indian lands and to restrain the Defendants and their successors in office from assessing, levying and attempting to sell said lands for taxes. The case is before the Court at the present time upon a motion by plaintiff for a summary judgment upon the pleadings, an answer having been interposed. While there may be certain controverted issues raised by the pleadings, these would seem to be rather immaterial to a solution of the main issue, at least counsel agree that the matter may be disposed of effectively upon the motion.

A brief running sketch of the situation involved in the controversy as revealed by the pleadings, the statutes and the facts of which the Court will take judicial notice for the purpose of considering the motion, is substantially as follows: The Shoshone, or Wind River, Indian Reservation in the central part of Wyoming was established through treaty with the Indians in 1869, 18 Stat. 685. By subsequent treaty, 15 Stat. 673, the boundaries were reduced and in 1904 the tribe ceded that portion of the reservation lying North of the Wind River to the United States. It was agreed that this portion of the reservation might be settled by non-Indians with the understanding that the United States would pay to the tribe an agreed amount for all acreage which was settled. Thereafter this portion of the reservation was commonly known as the "ceded portion", and the remaining portion, lying South of the Wind River, was commonly known as the "diminished portion" of the reservation. Subsequent to the 1869 treaty, the United States moved the Arapahoe tribe of Indians on the lower, or eastern portion, of the reservation which they have since occupied. At a subsequent date the Shoshone tribe brought a suit against the United States to recover damages caused by the Arapahoe tribe occupying and using a large portion of its reservation. This litigation finally ended in the tribe recovering judgment against the United States in an amount exceeding four million dollars. United States v. Shoshone Tribe of Indians, 304 U.S. 111, 58 S.Ct. 794, 82 L.Ed. 1213. It then became necessary for the United States to administer this fund for the benefit of the Indian tribe and Congress enacted a law in connection therewith which is commonly known as "The Shoshone Judgment Fund Act". 25 U.S.C.A. §§ 571–577, 53 Stat. 1128–1130. The provision of this Act necessary for consideration here are that the Secretary of the Interior is directed to restore to tribal ownership all undisposed of surplus of ceded lands which were not under lease or permit to non-Indians and to restore to tribal ownership the balance of said lands progressively when said lands may be acquired by the government for Indian use, all such regulations to be subject to valid existing rights and claims with a proviso as to lands within reclamation projects, not material here. The sum of one million dollars of the judgment fund was made available upon the request of the tribe for the purchase of lands then in private ownership within the ceded portion of the reservation, with the approval of the Secretary of the Interior, and the lands so purchased should be taken in the name of the United States in trust for the Shoshone and Arapahoe tribes of Indians of the Wind River Reservation with the proviso that such lands so acquired should not be subject to purchase by individual Indians with restricted funds or by exchange. It is to be noted that nothing is said in the Act in regard to the lands so purchased with these funds being exempt from taxation.

After the opening of the lands in the ceded portion of the reservation to public entry, a considerable acreage had been entered by private parties, and with the funds so made available, the Secretary of the Interior proceeded to purchase such lands to be held in trust by the United States as tribal lands. These lands had theretofore been assessed and taxed by the County of Fremont. After the lands had been purchased by the Secretary, the County of Fremont continued to assess and tax these lands in the year 1941 and in 1942, the taxes not having been paid, the lands were advertised for sale for unpaid taxes and sold, the County bidding them in at the sale for the amount of the unpaid taxes. These, and other acquired lands, were subsequently assessed and became the basis of this suit by the United States to quiet the title and to restrain further action by the County Officials in the matter of the taxation of the lands. This presents clearly the legal issue in the controversy here, plaintiff claiming that the lands being Indian lands owned and held by the United States in trust for the Indian tribes are exempt from taxation and the defendant contending to the contrary.

Numerous statutes and laws governing Indian tribes in the United States, and likewise many cases construing them, have been cited by counsel. It will be unnecessary to consider them all but only to gather the trend of the congressional and judicial minds in handling the same or related situations. To do otherwise would unduly prolong this memorandum. After having heard the oral arguments of counsel and having considered the Memorandum Briefs the conclusion is that this case must be ruled by the Supreme Court de-

cision in Shaw v. Gibson-Zahniser Oil Corporation, 276 U.S. 575, 48 S.Ct. 333, 72 L.Ed. 709, decided in April 1928. That was a case in which land in private ownership in Oklahoma was purchased by consent of the Secretary of the Interior for a full-blood Indian, with monies derived as royalties from his restricted allotment. The deed, as required by the Secretary and the Court, provided that the land should not be alienated during the life of the grantee prior to the expiration of the restricted period without the consent and approval of the Secretary. The land was subsequently let for oil and gas exploitation under departmental lease and a tax levied upon the leaseholders under the State Law, measured by a percentage of the gross value of the oil and gas produced, less the royalty interest of the Indian owner. The case was certified to the Supreme Court by the Circuit Court of Appeals on Reserved Questions. These questions, and the answers of the Supreme Court, fully outline the theory of the Supreme Court in announcing its conclusions. The certified questions were as follow (Page 577):

"1. Had the Secretary of the Interior, on October 24, 1915, when this land was purchased, power to exempt from such state taxation land purchased under his supervision for a full blood Creek Indian with trust funds of that Indian, where the land so purchased was, at that time, subject to all State taxes?

"2. Is this tax a forbidden tax upon a federal instrumentality?"

(Page 582:) "Question 1: Answered No.

"Question 2: Answered No."

In that case the first question concerned the power of the Secretary of the Interior to exempt from taxation for an individual Indian, land or the income therefrom, purchased with restricted funds. In this case the purchase of lands was with Indian funds for the benefit of the entire tribe and the United States is attempting to secure exemption from taxation which is the legal equivalent to such action by the Secretary of the Interior. In each case the right to exempt from taxation in the absence of Statutory declaration is involved. We can see no logical distinction in legal principle whether the lands so purchased were for the benefit of an individual Indian or for a tribe of Indians. The second question,

answered in the negative by the Supreme Court, decreeing that the tax is not a forbidden tax upon a Federal instrumentality, is identical in principle in the cited case and the case at Bar. The Supreme Court held that the Secretary of the Interior, absent the direction of Congress, could not exempt the Indian lands or the proceeds therefrom from taxation and here the United States is attempting, without the authority of Congress, to secure the exemption of these lands from taxation. In the Shaw case, page 581 of 276 U.S., page 335 of 48 S.Ct., 72 L.Ed. 709, the Court fully outlines its theory which rules its decision in the following language: "There are some instrumentalities which, though Congress may protect them from state taxation, will nevertheless be subject to that taxation unless Congress speaks. See Goudy v. Meath, 203 U.S. 146, 149, 27 S.Ct. 48, 51 L.Ed. 130; Gromer v. Standard Dredging Co., 224 U.S. 362, 371, 32 S.Ct. 499, 56 L.Ed. 801; Fidelity & Deposit Co. v. Pennsylvania, 240 U.S. 319, 323, 36 S.Ct. 298, 60 L.Ed. 664; Union Pacific Railroad Co. v. Peniston, 18 Wall. 5, 21 L.Ed. 787; Choctaw, O. & G. R.R. v. Mackey, 256 U.S. 531, 537, 41 S.Ct. 582, 65 L.Ed. 1076; Central Pac. R.R. v. [People of State of] California, 162 U.S. 91, 126, 16 S.Ct. 766, 40 L.Ed. 903. These lands we take to be of that character."

That the principle laid down in the Shaw case is still recognized as the law by the Supreme Court is illustrated by reference to a number of cases.

In Superintendent of Five Civilized Tribes v. Commissioner, 295 U.S. 418, 55 S.Ct. 820, 79 L.Ed. 1517, decided in May 1935, which concerned the income of funds derived from a restricted allotment of a full-blood Indian and held by the United States in trust for him under the direction of the Secretary of the Interior, it was held that such income is subject to a Federal income tax. In that case the principle of Shaw v. Gibson, supra, was recognized.

In Board of County Commissioners v. Seber, 318 U.S. 705, 63 S.Ct. 920, decided in April 1943, concerning tax immunity the Shaw case was again cited with apparent approval.

In Oklahoma Tax Commission v. United States, 319 U.S. 598, 63 S.Ct. 1284, 87 L. Ed. 1612, decided in June 1943, the principle of the Shaw case was again definitely

used by the Supreme Court in deciding an important angle of that litigation. In all these cited cases, and also in United States Trust Company v. Helvering, 307 U.S. 57, 59 S.Ct. 692, 83 L.Ed. 1104, it is reiterated as a principle that exemptions from taxation do not rest upon implication accentuating the rule that where such exemptions obtain they must be affirmatively declared by legislative power.

It would seem that Congress is gradually attempting a policy of broadening the scheme of rehabilitating the Indian by adding responsibility to his role as a ward. The High Court itself is cognizant of the desirability of such a program. This is illustrated by the language of Chief Justice Stone in the Shaw case, supra, in that language found on page 580 of 276 U.S., page 335 of 48 S.Ct., 72 L.Ed. 709:

"In this, as in other Indian legislation, opportunity is afforded for their emancipation by imposing upon them duties as well as giving them the privileges of citizens and property owners, including the duty to pay taxes.

"In a broad sense all lands which the Indians are permitted to purchase out of the taxable lands of the state in this process of their emancipation and assumption of the responsibility of citizenship, whether restricted or not, may be said to be instrumentalities in that process. But they are far less intimately connected with the performance of an essential governmental function than were the restricted allotted lands, and the accomplishment of their purpose obviously does not require entire independence of state control in matters of taxation. To hold them immune would be inconsistent with one of the very purposes of their creation, to educate the Indians in responsibility, * * *."

More recently the Supreme Court has spoken upon the matter of tax exemption, as found in Helvering v. Mountain Producers Corporation, 303 U.S. 376, 58 S. Ct. 623, 82 L.Ed. 907. The writer refers to this case with more or less of a feeling of intimacy for the reason that he was the author of the opinion in the Circuit Court of Appeals, 10 Cir., 92 F.2d 78, in which the holding was reversed by this decision, and if it can be said that there is any degree of satisfaction in being reversed by a higher Court, it is in having the reversing Court repudiate and overrule its own decision upon which one's own decision is based. In the Mountain Pro-

ducers case the Supreme Court overruled the case of Gillespie v. Oklahoma, 257 U. S. 501, 42 S.Ct. 171, 66 L.Ed. 338, in which case the State had been denied the right to enforce its tax upon income derived by a lessee from shares of oil and gas received under leases of restricted Indian lands. This was another advance step by the Supreme Court in attempting to restore the reasonable theory of requiring Indians to pay their proportionate share of governmental expenses through taxation.

Any plan of rehabilitation for the Indian to be a success must gradually eliminate the matter of treating the Indian as a ward to the extent that he is guarded as a small child by a parent. His successful future as a citizen of the country entitled to exercise the right of franchise can only be brought into fruition by requiring that he assume some responsibilities of citizenship if he is to have all of its privileges.

In United States v. Mummert, 8 Cir., 15 F.2d 926, almost the exact question presented in the case at bar was decided with the distinction heretofore outlined, that the funds used for the purchase of lands were those of an individual Indian and not tribal funds. The Court there held that lands previously patented in fee simple can be taxed when purchased by Indians with consent of the Secretary of the Interior with proceeds of restricted land held by the government for the use of the Indians, even though the deed contained restriction against alienation. The lands here in controversy were previously patented lands in the hands of private parties and theretofore subject to taxation. It is unnecessary to inquire whether or not Congress has the power to exempt this class of lands from taxation for by the Act under consideration it had not presumed so to do.

■ The argument has been advanced that the Constitution and Statutes of the State of Wyoming form an obstruction to the taxation by a division of the State of the character here involved. This may be disposed of briefly with the observation that the form of taxation here involved is not in any way in conflict with the Wyoming constitutional or statutory provisions.

■ For the reasons stated, the motion by plaintiff for a summary judgment

upon the pleadings in this case should be overruled and denied. Inasmuch, however, as there would appear to be no controverted questions which are material in the decision of the principle which controls the case and that it can be decided upon the strictly legal issues in connection with the prayer of the defendants that the cause of action be dismissed, a final judgment may be submitted on or before January 10, 1944, in favor of the defendants and against the plaintiff, adjudging that the cause of action of the plaintiff be dismissed upon the merits, each party to pay its own costs and reserving to the plaintiff exceptions to the rulings of the Court. As the case is disposed of upon motion, no findings of fact and conclusions of law would seem to be necessary.