THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* RAFAEL A. BURGOS FUENTES, Defendant and Appellant. THE SAME, Plaintiff and Appellee, *v.* EDUARDO LÓPEZ VÁZQUEZ, ETC., Defendant and Appellant.

Nos. 15299 and 15300. Argued December 18, 1952. —Decided December 22, 1953.

*F. Hernández Vargas* and *J. Hernández Vallé* for appellants.
*José Trías Monge, Attorney General,* and *J. Rivera Barreras,
Fiscal of the Supreme Court,* for appellee.

MR. JUSTICE PÉREZ PIMENTEL delivered the opinion of the Court.

In the former District Court of Puerto Rico, Guayama Section, separate informations were filed against appellants, Rafael A. Burgos Fuentes and Eduardo López Vázquez, for a violation of the provisions of Act No. 53 of June 10, 1948 (Spec. Sess. Laws, p. 170), as amended. Burgos Fuentes was charged with five counts and López Vázquez with two. The informations are similar and the recital of the counts is practically identical except for the place and date of the alleged

occurrences. To understand the nature of these counts it suffices to read the first count against Burgos Fuentes, which is copied below:

"COUNT NUMBER ONE

"The aforesaid defendant, Rafael A. Burgos Fuentes, on or about July 25, 1948, and in the Municipality of Cayey, Puerto Rico, unlawfully, maliciously, criminally, wilfully and knowingly, being a leader and an active member of the group known as 'Nationalist Party of Puerto Rico,' which is directed by and composed of persons who promoted, advocated, advised and preached and promote, advocate, advise and preach the overthrowing, paralyzation and subversion of the Insular Government of Puerto Rico, or any political subdivision thereof by force and violence; then and there, the aforesaid defendant organized and helped to organize a group and assembly of persons who promoted, advocated, advised and preached the overthrow, paralyzation and subversion of the Insular Government of Puerto Rico or any political subdivision thereof by force and violence, said help consisting of the aforesaid defendant, Rafael A. Burgos Fuentes, organizing and assembling in said municipality of Cayey and leading from there to the municipality of Guánica, a group of persons belonging to the so-called 'Ejército Libertador' or 'Cadetes de la República' an entity of a military character created, organized and composed of directors and members of the group known as 'Nationalist Party of Puerto Rico' and attached and belonging to said group of persons participate as the aforesaid group of persons participated, in an assembly and other acts held on that day in said municipality of Guánica by the group known as 'Nationalist Party of Puerto Rico'; all of it performed by the afore-mentioned defendant as part of a separatist movement directed by the defendant herein and by Tomás López de Victoria, Virgilio Mercado, Heriberto Castro, José Antonio Negrón Rodríguez, Ramón Pedrosa Rivera and other persons all belonging to the so-called group 'Nationalist Party of Puerto Rico,' said movement being directed to achieve the separation of Puerto Rico from the United States by force and violence, culminating in a rebellion which commenced in Puerto Rico on or about October 30, 1950."

The defendants moved the trial court to dismiss the information on several grounds which we shall hereinafter dis-

cuss. Their petition was denied. On the days set for the hearings of the cases, the defendants waived their right to a trial by jury. They again filed a petition for a dismissal of the information on the ground that the court lacked jurisdiction and that Act No. 53 of 1948, which was alleged to have been violated, was unconstitutional. When the latter contentions were overruled, the defendants agreed that if the witnesses of the People testified, they would uphold the allegations of the informations, and they waived their right to introduce evidence. Under these circumstances the court found defendants guilty and sentenced Burgos Fuentes to serve a term of from one to five years' imprisonment in the penitentiary for each one of the counts and López Vázquez to serve a term of from one to fifteen months' imprisonment in the penitentiary for each count, the sentences to run concurrently with any other imprisonment term in the penitentiary which might have been rendered against the defendants. Feeling aggrieved, defendants appealed to this Court, and since in both appeals the same questions are raised, we ordered their consolidation.

The appellants charge the trial court with the commission of the following:

### "SOLE ERROR

"The lower court committed a serious error of law in failing to order the definite filing of these criminal causes, freely acquitting the defendants, when it dismissed the following questions of law:

"1. Act No. 53 of June 10, 1948 is nonexistent in law.

"2. Act No. 53 of June 10, 1948 is unconstitutional; the third paragraph of the first section thereof being unconstitutional in itself, irrespective of the rest of said Act.

"3. Act No. 53 of June 10, 1948 is inapposite to the defendants-appellants' case, the insular courts lacking jurisdiction.

"4. The offense conceived by Act No. 53 of June 10, 1948 is of a continuous nature; all the acts allegedly committed in contravention of said law constitute a single indivisible act and a single offense; and the defendants were already tried and

convicted at the District Court of Puerto Rico, San Juan Section, for the same alleged offense; (jeopardy)."

■ The first error assigned lacks merit. Appellants contend that Act No. 53 of June 10, 1948 [1] punishes the commission of specific acts tending to overthrow, paralyze, or subvert the "Insular Government," or any political subdivision thereof, it being a fact that when that Act was approved by our Legislative Assembly, there was no government, politically and legally speaking, known as the "Insular Government," since at the time the Congress of the United States approved the Foraker Act in 1900 and the Jones Act in 1917, it created a politico-juridical body known as "The People of Puerto Rico," and in both statutes it is provided that the government of "The People of Puerto Rico" shall be called "The Government of Puerto Rico." They further urge that in approving Act No. 53 the "Legislature of Puerto Rico meant to protect the 'Insular Government,' government of an Island, we know not which Island, from subversive propaganda and activities . . ." They conclude, therefore, that Act No. 53 has no existence in law.

At the outset, it should be noted that in the Organic Act itself, which has been invoked by the appellants, the "Government of Puerto Rico" is also called "insular govern-

---

[1] Said Act provides that the commission by any person of any of the following Acts shall constitute a felony:

"1. To promote, advocate, advise or preach, wilfully or knowingly, the necessity, desirability, or expediency of overthrowing, paralyzing, or subverting the Insular Government, or any political subdivision thereof, by means of force or violence;

"2. To print, publish, edit, circulate, sell, distribute, or publicly exhibit, with the intent of overthrowing, paralyzing or subverting the Insular Government or any political subdivision thereof, any writing or publication by which the necessity, desirability, or convenience of overthrowing, paralyzing, or subverting the Insular Government, or any political subdivision thereof, by means of force or violence, is promoted, advocated, advised or preached;

"3. To organize or help to organize any association, group or assembly of persons who promote, advocate, advise, or preach the overthrowing or subverting of the Insular Government, or any subdivision thereof, by means of force or violence."

ment" [2] and "Insular Government of Puerto Rico." [3] In that same statute the Treasury of Puerto Rico is called "Insular Treasury." [4] And in subsequent Acts, as for example the one approved on March 4, 1931, "An Act to Coordinate the Agricultural Experiment Station work and to extend the benefits of certain Acts of Congress to the Territory of Puerto Rico,"[5] the Congress of the United States refers to the "Insular Government" and not to the "Government of Puerto Rico." It could not be validly urged that in said law Congress legislated for the government of any Island. This same Court has referred to the "Government of Puerto Rico" and to the "Insular Government" as synonyms. *People ex rel. Castro* v. *Padrón*, 60 P.R.R. 777, 786.

When Congress created the politico-juridical body "The People of Puerto Rico" with its Government of Puerto Rico, it provided that the local legislative powers of that government be vested in the "Legislative Assembly of Puerto Rico." In that way a legislative authority was created by delegation of Congress and with specific limitations. It would be absurd to think that the legislative authority had power to legislate, as in the case of Act No. 53, to protect a government other than that of Puerto Rico, whether it be called in the text of the law *insular government* or by any other name. Even in the case of a Sovereign State, the courts of no country execute the penal laws of another and the obligation of a statute cannot transcend the legislative power to the State which may enact it. *The Antelope*, 10 Wheat (U. S.) 66, 123; *Huntington* v. *Attrill*, 146 U. S. 657, 669; *State* v. *Volpe*, 155 Atl. 223; *People* v. *MacDonald*, 24 C.A. 2d 702, 76 P. 2d 121. For the reasons set forth, we reject appellants' contention to the effect that Act No. 53 has no existence

---

[2] Section 3 of the Organic Act (Jones Act of 1917).
[3] Section 52 of the same Act.
[4] Sections 34 and 50 of the Organic Act.
[5] U. S. Statutes at Large, Vol. 46, 1929–31, chapter 494, p. 1520.

in law. This brings us to consideration of the second and third grounds of the error alleged to have been committed by the trial court.

### Constitutionality of Act No. 53 and Jurisdiction of the Insular Courts to Entertain the Case of the Defendants-Appellants.

 The appellants contend (1) that the Legislature of Puerto Rico lacked power to enact Act No. 53 and (2) that the field covered by that law had already been covered by the Congress of the United States when it approved on June 28, 1940 the "Alien Registration Act" known as the Smith Act, which excludes the application in Puerto Rico of Act No. 53.

In support of these two propositions they urge that Act No. 53 is a measure adopted by the Government of Puerto Rico to prevent a rebellion, which is a matter of sovereignty; that our Legislature lacks power, because it was not delegated by the American Congress, to legislate on matters of sovereignty; that the Foraker Act as well as the Jones Act entrusted the Executive with duties to fulfill in cases of insurrection; [6] that Puerto Rico absolutely lacks attributes of sovereignty and that the only sovereignty existing herein is that of the United States whose defense is exclusively reserved to the Federal Government. They further affirm that "Since it in nowise appears that the Legislature of Puerto Rico may pass laws protecting the sovereignty of the United

---

[6] The appellants refer to the provisions of § § 2 and 12 of the Organic Act (Jones Act) of 1917. By the former the Governor of Puerto Rico is granted power to suspend the privilege of the writ of habeas corpus when in case of rebellion, insurrection or invasion the public safety may require it, and by the latter he is empowered to call upon the commanders of the military and naval forces of the United States in the Island or summon the *posse comitatus,* or call out the militia to prevent or suppress lawless violence, invasion, insurrection or rebellion, and he may place the island or any part thereof, under martial law until communication can be had with the President and the President's decision on the matter is made known.

States in Puerto Rico or to condition or eliminate that sovereignty, it is crystal clear that Act No. 53 of 1948, which punishes the overthrow of the Insular Government by means of force and violence is unconstitutional." On the other hand they contend that having been charged with a federal offense—violation of the Smith Act—the insular courts lack jurisdiction to entertain the case.

Appellants are wrong. Although Puerto Rico did not enjoy external sovereignty under the Foraker and Jones Acts and the powers and faculties of its government emanated from the only sovereignty existing here that of the United States,[7] it does not imply that the Government of Puerto Rico completely lacked the attributes of a sovereign government, at least insofar as matters of local interests were concerned.[8] In 1913 the National Supreme Court had already held that the government established by the Foraker Act came within the general rule exempting *a government sovereign in its attributes* from being sued without its consent. *Puerto Rico* v. *Rosaly and Castillo*, 227 U.S. 270, 57 L. Ed. 507. See, also, *Richmond* v. *People of Puerto Rico*, 99 N.Y.S. 743. In *Gromer* v. *Standard Dredging Co.*, 224 U.S. 362–370, the same court recognized that the purpose of the Foraker Act was to give Puerto Rico local self-government, conferring an autonomy similar to that of the States of the Union, and in *Puerto Rico* v. *Shell Co.*, 302 U.S. 253, adopting the language of a State case, it recognized, at page 267, the existence of a territorial sovereignty. The same development has occurred in the decisions of the Circuit Court of Appeals for the First Circuit. The Organic Act of 1917 vests very broad general powers in Puerto Rico.

[7] *Flores* v. *Alvarado, Warden*, 64 P.R.R. 850; *Puerto Rico* v. *Shell Co.*, 302 U. S. 253.

[8] These appeals do not involve any question in connection with the new status of the island under the Constitution of the Commonwealth of Puerto Rico. They only deal with the powers and attributes of the Government of Puerto Rico under the former Organic Act.

"Porto Rico is now sovereign," *Camuñas* v. *Puerto Rico Railway Light & Power Co.*, 272 Fed. 924. In the exercise of its police power, Puerto Rico possesses all the sovereign powers of a state and any exercise of that power which is reasonable and which is exercised for the health, safety, morals or welfare of the public, is not in contravention of the Organic Act or of any provision of the Federal Constitution, the power of the Legislature to regulate, restrain or prohibit what is injurious to the general welfare being universally recognized. *González* v. *People of Puerto Rico*, 51 F. 2d 61; *Armstrong* v. *Goyco*, 29 F. 2d 900. It was the purpose of the Foraker Act and the Jones Act to confer sovereignty upon Puerto Rico and an autonomy similar to that of the states. *Puerto Rico Tax Appeal*, 16 F. 2d 545.[9]

As part of its sovereign attributes, a state, in the exercise of its police power, may punish those who abuse freedom of speech by utterances inimical to the public welfare, tending to corrupt public morals, incite to crime or disturb the public peace. *Gitlow* v. *New York*, 268 U.S. 652; *Robertson* v. *Valdwin*, 165 U.S. 275, 281; *Patterson* v. *Colorado*, 205 U.S. 454–462; *Turner* v. *Williams*, 194 U.S. 279. Did the Legislature have, among the attributes of quasi-sovereignty granted to Puerto Rico, the power to enact a law, in the exercise of its police power punishing as an offense subversive utterances? The answer to this question is confined to determining (1) whether that law covers a local matter and (2) whether it is not forbidden by any federal law or is in substantial conflict with or violates Congress' public policy as expressed in any law.

There existed in Puerto Rico, as a matter of fact, two governments, the Federal and the Insular or Government of Puerto Rico. If, as we have seen, the latter had as attributes of its territorial sovereignty immunity from suit,

---

[9] This case was overruled on other grounds in *Smallwood* v. *Gallardo*, 275 U.S. 56.

*Puerto Rico* v. *Rosaly and Castillo, supra,* the power to enact a statute prohibiting the traffic in certain products notwithstanding the Federal Drugs Act, *González* v. *People of Puerto Rico, supra,* the power to enact a local antitrust Act, *Puerto Rico* v. *Shell Co., supra,* to enforce Congressional policies, by prescribing penalties affecting corporate land holdings, *Puerto Rico* v. *Rubert Co.,* 309 U.S. 543, to regulate the traffic in intoxicating liquors, *Bacardí Corporation* v. *Domenech,* 311 U.S. 150–167, we must conclude that it should have and actually had the most important power of protecting its very structure, prohibiting and punishing those acts performed for the purpose of overthrowing or destroying it by force or violence. We cannot attribute to Congress the intention of creating in Puerto Rico a local government without the inherent or implied powers which every government has to protect its very structure and which are essential attributes to the exercise of its functions. Therefore, the argument which we now reject, that Act No. 53 does not embrace a matter of local nature, is not sound. The obvious purpose of Act No. 53 is to protect the existing government in Puerto Rico, not from change by peaceable, lawful and constitutional means, but from change by violence, revolution and terrorism. *Dennis* v. *U. S.,* 341 U.S. 494. That law does not define and punish as an offense, as seems to be the opinion of the appellants, the acts in themselves of violence, revolution and terrorism, but it rather condemns prior conduct in preparation of and suitable for the performance of such acts. That is why, Act No. 53 does not interfere at all, or have any connection with the powers vested in the Executive by the Organic Act in case of a rebellion, insurrection or invasion.

The fact that the acts prohibited by Act No. 53 are also prohibited by the Federal Act (Smith Act) does not entail the invalidity of Act No. 53. In the afore-cited case of *Puerto Rico* v. *Shell Co., supra,* the validity of the local antitrust Act was discussed in connection with the Sherman Act.

The Supreme Court of the United States recognized (pages 259, 260) that the act charged in the information as a crime under the local statute was the same as that denounced as a crime in the Sherman Act, and that in each instance the offense was a crime against the sovereignty of the United States. But that court concluded still, that the Act of Congress did not preclude the adoption of the local Act by the insular legislature, and consequently the local district courts had jurisdiction of the offense. To that effect the Court states at page 261:

"The aim of the Foraker Act and the Organic Act was to give Puerto Rico full power of local self-determination, with an autonomy similar to that of the states and incorporated territories. [Citations.] The effect was to confer upon the territory many of the attributes of *quasi*-sovereignty possessed by the states—as, for example, immunity from suit without their consent. [Citations.] By those Acts, the typical American governmental structure, consisting of the three independent departments—legislative, executive and judicial—was erected. 'A body politic'—a commonwealth—was created. 31 Stat. 79, § 7, c. 191. The power of taxation, the power to enact and enforce laws, and other characteristically governmental powers were vested. And so far as local matters are concerned, as we have already shown in respect of the continental territories, legislative powers were conferred nearly, if not quite, as extensive as those exercised by the state legislatures.

"This comprehensive grant of legislative power made by Congress plainly recognizes the great desirability of devolving upon the local government the responsibility of searching out local offenses and prosecuting them in the local tribunals."

The text cited, because of its applicability to the case at bar, would suffice to leave answered the appellant's attack against the jurisdiction of insular courts to entertain their case. Moreover, it should be recalled that in citing the same *Shell* case, we said in *Luce & Co.* v. *Minimum Wage Board*, 62 P.R.R. 431, that in order ". . . that the federal statute excludes an Insular Act which seeks to protect the health and welfare of the public, it is not enough that the two laws

should embrace the same subject matter. It is required that the insular law by its own terms or in its practical administration be in conflict with the Act of Congress or manifestly infringe the public policy of the federal statute." And in *Avila* v. *District Court*, 68 P.R.R. 10, we stated that "In the absence of a specific prohibition in a Federal Act against local legislation, the Insular Government may exercise concurrent power by enacting, under its police power, legislation covering the same subject matter, provided the subject matter is not so intimately blended and intertwined with responsibilities of the National Government that the very nature of the subject matter in itself raises an inference that it is an exclusive concern of the National Government . . ." In our opinion, it is obvious that the protection of the government of Puerto Rico against subversive teachings is not within the exclusive competence of the national government. To maintain and guarantee order, peace, safety, and general welfare is primarily a responsibility of the insular government. To deny authority to legislate for those purposes would be tantamount to depriving it of those attributes essential for the exercise of its governmental functions. On the other hand, the public policy of both Acts is the same inasmuch as they both pursue the same aim or purpose and we fail to understand how Act No. 53, by its own terms or in practice, is in substantial conflict with the Federal Act. As to the argument that a conflict might arise as to which law shall be enforced and which jurisdiction invoked, we think fit to answer as we did in *Irizarry* v. *District Court*, 64 P.R.R. 90, with the following citation from the *Shell* case, "It is hard to see why a conflict as to which law shall be enforced and which jurisdiction shall be invoked should ever arise, since the officers charged with the administration and enforcement of both acts are, in the last analysis, under the control of the same sovereignty and, it well may be assumed, will work in harmony." Such harmony has always prevailed between the federal and the insular officers charged

with the administration and enforcement of Act No. 53 and the Smith Act, since, as a matter of fact, every person who in Puerto Rico has committed a violation of either Act has been prosecuted only in the insular courts for a violation of the local statute.

 The appellants further allege that paragraph 3 of § 1 of Act No. 53 of 1948 is unconstitutional by its own terms, irrespective of the unconstitutionality of the entire Act. That paragraph provides as follows:

"3. To organize or help to organize any association, group or assembly of persons who promote, advocate, advise, or preach the overthrowing or subverting of the Insular Government, or any subdivision thereof, by means of force or violence."

Appellants contend that this paragraph lacks sufficient criminal elements and that it is too vague, failing to offer necessary and essential information concerning the prohibited criminal act. They argue that although the latter paragraph was taken in part from the Smith Act, [10] by an inadvertence of our Legislature the element "knowing the purpose thereof" (a sabiendas) which appears in § 2 (a) (3) of the Federal Act was not included therein. In their opinion the absence of this element renders the third paragraph of the Insular Act unconstitutional and to that effect they state the following: "To hold a citizen criminally liable, he must act in his sound mind, with the criminal intent to perform the act and knowing that said act is prohibited and punishable, and in order to make him liable for the act of organizing a subversive assembly, it is essential that the citizen knows beforehand, that by said act he is violating the law, and knowing it, he wilfully organizes it."

---

[10] Section 2 (a) (3) of the Smith Act provides that following:

"Section 2 (a) It shall be unlawful for any person . . .

"(3) To organize or help to organize any society, group, or assembly of persons who teach, advocate, or encourage the overthrow or destruction of any government in the United States by force or violence; or to be or become a member of, or affiliate with, any such society, group, or assembly of persons, knowing the purposes thereof."

We disagree. Comparing both statutes we find that the third paragraph of § 1 of Act No. 53 of 1948 as well as § 2(a)(3) of the Smith Act punish as an offense the act of *organizing or helping to organize any association, group or assembly of persons to promote, advise or preach the overthrowing or subverting of the government, by means of force and violence.* Section 2(a)(3) of the Federal Act also punishes the act of being a member of or affiliation with any subversive society knowing the purposes thereof.[11] The element "knowing the purposes thereof" (*a sabiendas*) appears in the second part of § 2(a)(3) of the Federal Act, that is, the one which punishes the act of being a member or affiliation with a subversive organization. This notwithstanding, in the case of *Dennis* v. *United States, supra,* the contention that the Smith Act was vague was set aside and the constitutionality of § 2(a)(3) upheld. However, it was made clear in that case that the statute required as an essential element of the crime, proof of the intent to overthrow the government by force and violence by those charged with its violation.

The element "knowing the purposes thereof" is required by the Smith Act solely in the case of being a member of, or affiliate with, subversive organizations, apparently because of the actual fact that many persons affiliate with an organization without knowing its purposes. But the person who organizes or helps to organize any assembly of subversive persons cannot allege ignorance of that fact which is the one expressly punished by law. Therefore, it is unnecessary to include in the language defining the offense, the phrase "knowing the purposes thereof." Its omission however, does not exclude the need to prove the criminal intent, for as stated in the *Dennis* case, *supra,* "The structure and purpose of the statute demand the inclusion of intent as an element of the crime."

---

[11] By Act No. 13 of December 20, 1950 the Legislature of Puerto Rico added a similar provision to the Insular Act.

Finally appellants allege that the offense conceived by Act No. 53 is of a continuous nature and that they were already tried and convicted before the District Court of Puerto Rico, San Juan Section, for the same offense of which they are now accused (jeopardy).

The information filed against both appellants in the former District Court of Puerto Rico, San Juan Section, charges them with a violation of paragraph 1 of § 1 of Act No. 53, committed during the period comprised between October 20, 1948 and November 2, 1950.[12] On the other hand, the facts charged in the cases at bar cover more or less the same length of time, that is, from October 12, 1948 until October 30, 1950.[13] The first information was filed in the former District Court, San Juan Section, in December 1950 wherefore all the facts alleged in the information filed in the Guayama Section of that same court occurred prior to the filing of that first information. Therefore, if the offense defined and punished by Act No. 53 is of the kind known as a continuing offense, the plea of former jeopardy made by appellants should prevail, if there is also sufficient evidence in the record to show (1) the filing of the first information and (2) a former conviction under that information. This is so be-

---

[12] Specifically the information charges appellants with having "in or about the 26th and 27th of October, 1950, in the municipalities of Fajardo and San Juan, Puerto Rico, unlawfully, criminally, maliciously, wilfully and knowingly . . . advocated, advised, and preached the necessity, desirability and expedience of overthrowing, paralyzing or subverting the Insular Government of Puerto Rico and the political subdivisions thereof by means of force and violence . . ."

[13] In the information filed against Burgos Fuentes in the Guayama Section of the former District Court he was charged in each of the counts numbers 1, 2, 3 and 4 with violations of paragraph 3 of § 1 of Act No. 53, committed in the municipality of Cayey on July 25, 1948, October 12 of that same year, October 12, 1949 and October 26, 1950, respectively. In count number 5 he is charged with a violation of paragraphs 1 and 3 of the Act, committed in that same municipality during the months of June, July, August, September and October, 1950. López Vázquez was charged in count number 1 with a violation of the third paragraph of § 1 of the Act and in count number 2 with a violation of paragraphs 1 and 3.

cause in cases of a continuing offense the general rule is that prosecution cannot be brought piecemeal. "Once a case is instituted and concluded, it bars all prosecutions for the same offense as to the facts which occurred prior to indictment; but a new prosecution may be had for the same continuing offense, if committed subsequent to the date of indictment, irrespective of the result in the first case . . . . ." *People* v. *Lugo*, 64 P.R.R. 529. However, if we should hold, as the *Fiscal* of this Court alleges, that there is no proof in the record to support a plea of former jeopardy,[14] we would always have to consider the nature of the offense created by Act No. 53, since in the informations filed in Guayama, Burgos Fuentes was charged with five counts and López Vázquez with two, as different offenses, for similar acts, performed on different dates.

A continuing offense is a transaction or a series of acts set on foot by a single impulse and operated by an uninterrupted force no matter how long a time it may take. *State* v. *Johnson*, 194 S.E. 319, 322; *U. S.* v. *Midstate Co.*, 306 U.S. 161. According to the writings of Wharton, when the impulse is single only one indictment lies, no matter how long the action may continue, but if successive impulses are separately given, even though all unite in swelling a common stream of action, separate indictments lie. That writer further says that the test is to determine whether individual acts or the course of action which they constitute are prohibited; or if the former, then each act is punishable separately while if the latter, there can be but one penalty. 1 Wharton's *Criminal Law*, § 34, page 52; *Blackburger* v. *United States*, 284 U.S. 294, 302; 76 L. Ed. 306–308. It

---

[14] The defendants presented in the lower court a copy of the information filed against them in the San Juan Section of the former District Court in support of their plea of former jeopardy and they also requested that court to take judicial notice that the defendants had been prosecuted, convicted and sentenced in the San Juan Section. The *Fiscal* of this Court argued that judicial notice could not be taken and that therefore there was no proof of the former conviction.

has· also been said that "continuing" means enduring, not terminated by a single act or·fact; subsisting for a definite period or intended to cover or apply to successive, similar obligations or occurrences. And also that a continuing offense, therefore, is a breach of the criminal law not terminated by a single act or fact, but which subsists for a definite period and is intended to cover or apply to successive similar obligations or occurrences. *State* v. *Johnson, supra.*

As may be seen, it is not easy to establish a fixed and precise rule to determine when an offense is continuing. It depends in great part on legislative intent and on the words of the statute. Dangel, *Criminal Law*, page 376; 20 L.R.A. (N.S.) 783.

Neither the legislative history of Act No. 53, nor the debates in the House before its approval shed any light on this point. However, from the context of the statute, from the aim that it pursues and from the nature of the field which it has invaded, it may be inferred that the legislative intent was to define and punish an offense known as a continuing offense. Obviously Act No. 53 tries to prevent the existing government from being changed by means of force and violence. *Dennis* v. *United States, supra.* As a preventive measure the statute prohibits a series of acts pursuing said end, which it has divided into three groups under the three paragraphs of its first Section. The first paragraph prohibits subversive preaching by means of spoken words, paragraph 2 prohibits the same preaching but in writing, and paragraph 3 prohibits the organization of associations, groups, or assemblies of subversive persons. In other words, to achieve its end the Act tries to prevent subversive preach by means of speeches, printed matter or assemblies. In truth, it does not persecute individual acts, but teaching, attitude, preaching. In brief, a course of conduct and not the specific acts committed in obedience to that course of conduct is punished. Thus, it means, as we have

pointed out before, that the government cannot divide a single crime into as many offenses as acts committed.

There are powerful reasons in support of this view. At the outset, the practice of dividing the offense, as in the instant case, implies granting an opportunity for the development of the subversive preaching, which is clearly contrary to the purpose of the statute a purpose which would be frustrated if the government assume a dangerous attitude of waiting toward violators. On the other hand, if the government could divide the offense at its will, it would imply that the government could increase or aggravate the punishment prescribed by the statute, which is certainly severe enough, since it reaches a maximum of 10 years imprisonment and $10,000 fine.[15] Obviously this has not been the legislative intent.

Furthermore, we must bear in mind that Act No. 53 establishes a limitation on certain constitutional rights which are vital to the very existence of democracy, to wit: freedom of speech, of the press, and of assembly. Although those rights are not absolute, *Dennis* v. *United States, supra*, laws which in any way limit them should be strictly construed in order that such limitations may not transcend what is absolutely essential.

We conclude that the offense defined and punished by Act No. 53 is one of the kind designated as a continuing offense. Consequently, we must now turn to examine the plea of former jeopardy raised by the defendants-appellants.

To this defense the *Fiscal* of this Court raises two objections, (1) that the offense set forth by Act No. 53 is not

[15] Take the following example: A person organizes five assemblies of subversive persons during the term of one month. In each assembly he distributes writings where the need to overthrow the government by means of force is preached. Furthermore, this person makes a speech in each one of the assemblies preaching the same need. If the offense provided by Act No. 53 were not a continuing offense, that person would be subject to be condemned to suffer a maximum term of 150 years imprisonment in the penitentiary and $250,000 in fines, that is, on the basis of five violations of each one of the three paragraphs of § 1 of the Act.

of a continuing nature, and (2) that there is not sufficient evidence in the record to support the plea. The first objection has already been decided in favor of the appellants. Let us pass, on to the second. It is true that in the trial court the defendants confined themselves to presenting in evidence a copy of the information filed in the San Juan Section of the former District Court and that, as regards the judgment rendered under that information, instead of introducing it as evidence they requested the court to take judicial notice thereof. The contention of the Prosecuting Attorney is that the trial court could not take judicial notice of that judgment. However, he does not deny that the defendants-appellants were convicted and tried by the San Juan Section of the District Court. On the other hand, the appeal brought by the defendants against that judgment is still pending for decision in this Court. We assume that we can take judicial notice of a judgment which forms part of our own records. *Wiley* v. *United States*, 144 F. 2d 707; *National Fire Ins. Co.* v. *Thompson*, 281 U.S. 331; *Morse* v. *Lewis*, 54 F. 2d 1027; *Divide Creek Irr. Dist.* v. *Hollingsworth*, 72 F. 2d 859; *Commonwealth* v. *Di Stasio*, 11 N.E. 2d 799; *Alexander* v. *Hillman*, 296 U. S. 222; *Washington & Idaho Railroad* v. *Osborn*, 160 U.S. 103; *Aspen Mining & Smelting Co.* v. *Billings*, 150 U.S. 31.

The defense of former jeopardy will be sustained and, consequently, the judgments appealed from shall be reversed and others rendered acquitting the defendants-appellants.

Mr. Justice Negrón Fernández and Mr. Justice Ortiz did not participate herein.